1

2

3

4                    **UNITED STATES DISTRICT COURT**

5                        **DISTRICT OF OREGON**

6                        **PORTLAND DIVISION**

7

HENRIETTA WERTHY,                    )
8                                    )
                    Plaintiff,       )    No. 03:10-cv-00324-HU
9                                    )
vs.                                  )
10                                   )
MICHAEL J. ASTRUE,                   )  **FINDINGS AND RECOMMENDATION**
11  Commissioner of Social Security, )
                                     )
12                  Defendant.       )

13                 _____

14

15  David B. Lowry
    9900 S.W. Greenburg Road
16  Columbia Business Center
    Suite 130
17  Portland, OR 97223

18      Attorney for Plaintiff

19
    Dwight C. Holton
20  United States Attorney
    Adrian L. Brown
21  Assistant United States Attorney
    1000 S.W. Third Avenue, Suite 600
22  Portland, OR 97204-2904

23  Terrye E. Shea
    Special Assistant United States Attorney
24  Office of the General Counsel
    Social Security Administration
25  701 5th Avenue, Suite 2900 M/S 221A
    Seattle, WA 98104-7075
26
        Attorneys for Defendant
27

28

    1 - FINDINGS AND RECOMMENDATIONS

1

***TABLE OF CONTENTS***

2   *I.   PROCEDURAL BACKGROUND.* . . . . . . . . . . . . . . . . . *4*

3   *II.  FACTUAL BACKGROUND.*. . . . . . . . . . . . . . . . . . . *5*

4        *A.   Summary of the Medical Evidence.*. . . . . . . . . . *5*

5             *1.   Consultants' Reports.*. . . . . . . . . . . . . *5*

6             *2.   Werthy's medical records.*. . . . . . . . . . *19*

7        *B.   Summary of the Vocational Evidence.* . . . . . . . *31*

8             *1.   VE's testimony.*. . . . . . . . . . . . . . . *31*

9             *2.   Third-party evidence.*. . . . . . . . . . . . *33*

10       *C.   Medical Expert's Testimony.* . . . . . . . . . . . *34*

11       *D.   Werthy's testimony.* . . . . . . . . . . . . . . . *35*

12            *1.   July 14, 2008, Hearing.*. . . . . . . . . . . *35*

13            *2.   Personal Pain Questionnaire dated 2/24/04.* . . *39*

14            *3.   Activities of Daily Living questionnaire*
15                 *dated 2/24/04.* . . . . . . . . . . . . . . . *39*

16            *4.   Function Report dated 5/27/05.* . . . . . . . *40*

17       *E.   Third-Party Testimony.*. . . . . . . . . . . . . . *42*

18  *III. DISABILITY DETERMINATION AND BURDEN OF PROOF.*. . . . . . *46*

19       *A.   Legal Standards.*. . . . . . . . . . . . . . . . . *46*

20       *B.   The ALJ's Decision.* . . . . . . . . . . . . . . . *48*

21  *IV.  STANDARD OF REVIEW.*. . . . . . . . . . . . . . . . . . . *53*

22  *V.   DISCUSSION.*. . . . . . . . . . . . . . . . . . . . . . . *54*

23       *A.   Severity of Werthy's Impairments.* . . . . . . . . *54*

24            *1.   Depression & Borderline Intellectual*
                   *Functioning.* . . . . . . . . . . . . . . . . *54*

25            *2.   Insomnia.*. . . . . . . . . . . . . . . . . . *58*

26            *3.   Diarrhea and Headaches.*. . . . . . . . . . . *59*

27            *4.   Feet, Arm, & Hand Limitations.* . . . . . . . *59*

28       *B.   Residual Functional Capacity Determination.* . . . *61*

      **C.**    *Inaccurate Hypothetical; Ability to Perform Semi-Skilled Work.. . . . . . . . . . . . . . . .* **64**

      **D.**    *Numbers of Available Jobs.. . . . . . . . . . . .* **66**

**VI.**  **CONCLUSION.. . . . . . . . . . . . . . . . . . . .** **68**

**VII.** **SCHEDULING ORDER.. . . . . . . . . . . . . . . . .** **68**

*/ / /*

*/ / /*

*/ / /*

*/ / /*

*/ / /*

*/ / /*

*/ / /*

*/ / /*

*/ / /*

*/ / /*

*/ / /*

Hubel, United States Magistrate Judge:

The plaintiff Henrietta Werthy seeks judicial review pursuant to 42 U.S.C. § 405(g) of the Commissioner's final decision denying her application for Supplemental Security Income ("SSI") under Title XVI of the Social Security Act, 42 U.S.C. § 1381 *et seq.* Werthy argues the Administrative Law Judge ("ALJ") erred in finding many of her impairments not to be "severe"; finding she retains the residual functional capacity to work; presenting an improper hypothetical question to the Vocational Expert; and ignoring relevant evidence regarding the numbers of available jobs. *See* Dkt. #1.

3 - FINDINGS AND RECOMMENDATIONS

## I.  PROCEDURAL BACKGROUND

Werthy protectively filed her application for benefits on April 22, 2005, at age 45, claiming a disability onset date of January 1, 1993.[1]  (A.R. 18, 70-72; *see* A.R. 692)  Her application was denied initially and on reconsideration.  (A.R. 45, 46, 52-60)  She requested a hearing (A.R. 61), and a hearing was convened on February 26, 2008, before an ALJ.  (A.R. 682-94)  Werthy was represented by an attorney at the hearing, and a Vocational Expert ("VE") also appeared at the hearing.  No testimony was taken at the hearing, which consisted only of colloquy between the ALJ and Werthy's attorney.  The ALJ directed the attorney to obtain certain additional evidence that was missing from Werthy's medical records, and the hearing was adjourned and reconvened on July 14, 2008.  (A.R. 634-81)  Werthy again was represented by counsel, and she testified on her own behalf.  A VE and a medical expert ("ME") also testified at the hearing.  *Id.*

On August 14, 2008, the ALJ issued her decision, finding that although Werthy's "neck and back pain," in combination, are severe impairments (A.R. 20), they do not meet the Listing level of

---

[1]Werthy filed a prior application for SSI benefits on January 15, 2004, alleging a disability onset date of August 25, 1993.  (A.R. 67-69)  The application was denied on April 28, 2004. (A.R. 47-51)  Werthy did not appeal.

Interestingly, both Werthy's attorney and the Commissioner's attorney state, in their clients' briefs, that Werthy's alleged disability onset date in connection with the application under review is August 25, 1993.  *See* Dkt. #15, p. 4 (citing A.R. 70, 113); Dkt. #18, p. 2 (citing A.R. 70).  Page 70 of the Administrative Record, cited by both parties, lists the correct January 1, 1993, alleged onset date. Page 113 of the record, cited by Werthy's counsel, is a Disability Report in connection with Werthy's prior application for benefits.  The correct disability onset date alleged in the present action is January 1, 1993.  *See* A.R. 70, 692.

4 - FINDINGS AND RECOMMENDATIONS

severity.   The ALJ further found that although Werthy does not retain the residual functional capacity to perform her past relevant work as a home care giver, she is able to perform other semi-skilled and unskilled jobs that exist in significant numbers in the national economy.  (A.R. 20-26)  Werthy appealed the ALJ's decision, and on February 4, 2010, the Appeals Council denied her request for review, making the ALJ's decision the final decision of the Commissioner.  (A.R. 6-8)

Werthy filed a timely Complaint in this court, seeking judicial review of the Commissioner's final decision.  Dkt. #2. The matter is fully briefed, and I submit the following Findings and Recommendation pursuant to 28 U.S.C. § 636(b)(1)(B).

## II.   FACTUAL BACKGROUND

### A.   Summary of the Medical Evidence

#### 1.   Consultants' Reports

Werthy saw James B. Powell, Psy.D. on August 16 and 28, 2001, apparently for a consultative mental status evaluation.[2]  (A.R. 486-95)  Werthy stated that ever since her accident on August 25, 1993, she had been unable to "lift at all" and she was unable to "sit or stand for a long time."  (A.R. 486)  She reported being forgetful at times, having four or more headaches a week, and having neck and lower back pain "all the time."  (Id.)  She indicated her doctors had been unable to find a cause for her ongoing pain.  She also stated she had been experiencing depression

_____

[2]Page 1 of the eleven-page report is missing, which would have stated the reason for the evaluation and listed the referring agency - likely the state disability determination service.

"real bad" for two years, describing symptoms of excessive sleeping, increased irritability, and "a bad attitude." (*Id.*)[3]

Werthy described daily activities such as helping her mother care for two young girls, playing the piano or guitar, and doing household chores. She indicated that when she did housework, she had to sit down and rest for twenty minutes after only a short time before she could continue. She stated her mother helped her fold clothes, and also helped her keep her living area clean. She sometimes needed her mother's assistance to put on pants, especially during cooler weather. She did her own shopping and cooking, but she had to take rest breaks during meal preparation and she often used a microwave. She stated she quit driving due to her back and neck problems. (A.R. 486-87) She also stated she had stopped working due to back and neck problems following her 1993 accident. (A.R. 487)

Dr. Powell administered the Wechsler Adult Intelligence Scale - Third Edition (WAIS-III), on which Werthy "obtained a full Scale IQ Score and Performance IQ Score of 75, which is at the 5th percentile and falls within the Borderline (Well Below Average) range when compared with other adults between the ages of 35 and 44." (A.R. 490) Her Verbal IQ Score was 78, which also is in the Borderline range. (*Id.*)

Dr. Powell also administered the Minnesota Multiphasic Personality Inventory-2 (MMPI-2), the results of which he found to

---

[3]Werthy also discussed a history of fibroid tumors, and the record contains numerous progress notes regarding Werthy's menstrual problems, endometriosis, and desire to become pregnant. The court has omitted any discussion of these problems which are unrelated to Werthy's claim that she is disabled.

be "generally a valid representation of the clinical profile of this client." (A.R. 491) He noted the following regarding Werthy's results on the MMPI-2:

> In considering the score configurations, these individuals tend to focus to a great extent on various somatic and physical problems. Often, these physical symptoms may be more nonspecific and vague and may include back-aches or gastrointestinal symptoms. Even though these scales cannot reliably be used to distinguish between a functional disorder and an actual physical disease, in any event, these individuals often have a tendency to convert psychological stress into somatic and physical symptoms. They also may be experiencing a mild to moderate level of emotional distress, which may be characterized by tension, anxiety and dysphoria. They may experience an increased level of frustration and irritability. These individuals also may report having concentration difficulties and may show a tendency to process information in a rather concrete manner. These individuals also may feel rather alienated from other people. They also may struggle with having a lack of drive.

(A.R. 492)

Dr. Powell's diagnostic impressions included "Major depressive disorder, recurrent, moderate"; "Pain disorder, associated with psychological features, provisional. Continue to rule out whether or not there is the presence of a general medical condition."; alcohol and cocaine abuse, in sustained full remission per Werthy's report; "Borderline intellectual functioning, mainly based upon current test results. Client's reported history would seem to indicate a relatively higher level of intellectual functioning." (*Id.*) He estimated Werthy's current GAF at 58.[4]

---

[4]A GAF of 58 indicates moderate symptoms. *See Raegen ex rel. Syzonenko v. Astrue*, slip op., No. 10-CV-401-BR, 2011 WL 1756131 at *5 n.3 (D. Or. May 9, 2011) (citing DSM-IV at 31-34).

7 - FINDINGS AND RECOMMENDATIONS

Dr. Powell concluded Werthy likely had been "experiencing symptoms that [were] consistent with at least a moderate level of clinical depression. Her reported psychological symptoms appear[ed] to be secondary to her reported medical and physical condition." (A.R. 493) He opined Werthy had a pain disorder, but noted that no formal medical diagnosis had been made, and he suggested "further medical evaluation should be undertaken to determine what actual physiological or medical conditions may exist." (*Id.*) He indicated Werthy's psychological symptoms included "prolonged periods of dysphoria and a depressed mood and an increased level of irritability, . . . [and] an increased level of isolation from others." (*Id.*) He noted Werthy had "rather limited" reading skills; "adequate" vocabulary, immediate attention span, and nonverbal logical reasoning and analytical skills; and some concentration difficulties. (*Id.*)

Dr. Powell opined that Werthy's primary obstacle to employment would be her neck and back pain. From a psychological standpoint, he indicated, "It is likely that symptoms of depression may interfere in the sense that she may struggle to have an adequate level of drive in pursuing activities that would help her be more independent." (A.R. 494) However, he further noted that Werthy's symptoms of depression were not "at such a level of severity as to hinder [her] from at least taking more active steps in pursuing future work activity." (*Id.*) He found Werthy's prognosis for being able to return to work in the future to be "good at this time, but will largely depend upon her compliance with treatment recommendations and the resolution of the symptoms of pain that she has identified." (*Id.*) He opined that the longer Werthy remained

8 - FINDINGS AND RECOMMENDATIONS

inactive, the more her dependence on others would increase.  (A.R. 495)

On December 3, 2001, Sharon Eder, M.D., a specialist in Internal Medicine, reviewed the record and completed a Residual Physical Functional Capacity Assessment form. (A.R. 349-54)  She opined Werthy could lift/carry up to twenty pounds occasionally and ten pounds frequently; sit and stand/walk for up to six hours each in an eight-hour workday; push/pull without limitation; stoop and crouch occasionally; and perform all other postural activities (e.g., climbing and balancing) frequently.  She found Werthy to have no other limitations on her physical capacity to work.  *Id.* On December 21, 2009, consultant John M. Pesado, M.D. (specialty unknown) reviewed the record and agreed with all of Dr. Eder's findings.  (A.R. 375)

Also on December 3, 2001, a DDS consultant (whose name is illegible in the record and whose specialty is unknown) completed a Mental Residual Functional Capacity Assessment form (A.R. 355-58), and a Psychiatric Review Technique form (A.R. 359-72).  The consultant found Werthy to have borderline intellectual functioning, recurrent depression, and a substance addiction disorder in remission per Werthy's report. (A.R. 359, 360, 362, 367)  He opined these impairments would cause moderate limitations in Werthy's ability to maintain social functioning, and mild limitation in her ability to maintain concentration, persistence, or pace.  (A.R. 369)  He indicated she likely would be moderately limited in her ability to understand, remember, and carry out detailed instructions; to interact appropriately with the general public; and to set realistic goals or make plans independently of

9 - FINDINGS AND RECOMMENDATIONS

others.  (A.R. 355-56)  He opined she would not be significantly limited due to mental impairments in any other area of functioning. *Id.*

In the consultant's notes, he indicated he had reviewed a form completed by Werthy where she stated she "takes Trazodone for sleep, has had 'real bad depression for past 2 yrs, excessive sleeping, increased irritability, bad attitude.'"  (A.R. 371)  He summarized Werthy's daily activities as follows:

> She helps her mother babysit (taking kids to park & playing w/them), spends time playing the piano or guitar, sometimes plays on the computer, reads the Bible, does household chores, cares for her hygiene & grooming, shops, cooks, uses public transp[ortation], prefers to stay by self, has a boyfriend.

(*Id.*)  The consultant found Werthy's episodes of depression to be linked to her medical condition.  He noted she has a history "of chronic neck & back pain, [and] fibroid tumors."  (*Id.*)  On December 26, 2001, psychiatrist C.S. Dagadakis, M.D. reviewed record and agreed with all of the DDS consultant's findings.  (A.R. 373-77)

On September 16, 2002, an unidentified consultant reviewed the record and completed a Psychiatric Review Technique form.  (A.R. 380-93)  The consultant's findings were virtually identical to those of the DDS consultant in December 2001.  (*Compare id. with* A.R. 359-72)

On November 12, 2002, Werthy was seen by psychologist Paul Brown, Ph.D. for a consultative mental status evaluation.  (A.R. 524-29)  She "denie[d] having any mental health problems" and "state[d] that her mental health reasons for filing for disability [were] 'not applicable.'"  (A.R. 524)  Dr. Brown noted Werthy was

10 - FINDINGS AND RECOMMENDATIONS

"quite cooperative," talkative, "open and friendly."  (A.R. 527)
Her thoughts were logical and well organized, and her memory was
good.  He noted Werthy's "intelligence by record is borderline with
a full scale score of 75 but her memory and her general knowledge
and her ability to reason seem much higher than this."  (*Id.*)  He
diagnosed Werthy with Depression NOS, history of substance abuse in
remission, "[r]ule out manic episodes possible cyclothymic
condition," "[b]orderline intellectual functioning by record but
her performance seems superior to this."  (A.R. 528)  He estimated
her prognosis to be "guarded," noting medications might improve her
pain and depression somewhat.  He further noted, "She has some good
stable qualities even though she is very dependent upon her mother
and might be able to return to work as she has some work history
and is competent in her thinking being very logical."  (*Id.*)

Dr. Brown further noted that if Werthy was awarded benefits,
there was some question whether she could manage her own funds due
to a "quite poor" ability with numbers.  (*Id.*)  Werthy stated that
due to her pain, she could not lift more than two pounds or walk
for any distance.  However, Dr. Brown noted she was able to sit
during the fifty-minute interview "without any noticeable pain
behavior."  (A.R. 529)  He opined Werthy could interact well with
coworkers and the public.  Werthy stated she wanted to return to
work and Dr. Brown noted "this might be possible."  (*Id.*)

On February 4, 2003, Linda Jensen, M.D., a Physical Medicine
and Rehabilitation specialist, reviewed the record and completed a
Physical Residual Functional Capacity Assessment form.  (A.R. 395-
400)  She opined Werthy could lift/carry up to twenty pounds
occasionally and ten pounds frequently; sit/stand and walk, each,

11 - FINDINGS AND RECOMMENDATIONS

for about six hours in an eight-hour workday; push-pull without limitation; and perform all types of postural activities occasionally, except she could balance frequently. (A.R. 396-97) Although she found Werthy's symtpoms were attributable to a medically-determinable impairment, she found the severity of the symptoms to be disproportionate to the expected severity or duration based on Werthy's medically-determinable impairments. (A.R. 398)

Dr. Jensen indicated Werthy was forty-three years old, 60" tall,[5] and weighed 210 pounds. Werthy alleged back pain since an accident in 1993, when a bus in which she was a passenger was struck by another vehicle. Her medical problems as of August 2002 were noted to be "chronic back pain, arthritis, CAT scan lumbar spine, DJD with disc protrusion, impingement, connective disc disease, L-4-5, obesity." (A.R. 399) A back fusion had been recommended, but notes indicate Werthy preferred "to take herbs, does not want surg[ery]." *Id.* Dr. Jensen noted prior consultants had found Werthy's complaints to be consistent, and her statements to be credible. Dr. Jensen expressly disagreed with the consistency assessment, finding as follows:

> Per the psych [consultative evaluation], claimant stopped all her medications, although she was planning on restarting them. She has advanced L45 [degenerative disc disease] with small protrusion, but no consistent radicular findings. There are some inconsistencies re function, e.g., sat comfortably through psych eval although she indicates sitting is a problem. The [Primary Care Physician] opines on 9-29-02 no work until eval'd for surgery. However, there's nothing to indicate a

---

[5]The SSA records later indicate Werthy is 70" tall. (A.R. 426)

> referral for a surgeon's opinion, it is not in
> functional terms, the claimant was to follow-
> up on this in one week but it looks like only
> medication samples were given.

(*Id.*)  Overall, Dr. Jensen agreed with the RFC limitations set forth by the previous consultants.  (*Id.*)

On April 7, 2004, Werthy saw Kim Webster, M.D., a family practitioner, for a consultative physical examination.  (A.R. 592-95)  Dr. Webster noted Werthy had a "very unusual" affect, and her behavior led the doctor to believe Werthy "may be retarded."  (A.R. 593)  Werthy got on and of the examination table, and removed and replaced her shoes, easily.  On examination, Werthy was noted to be 70" tall, weighing 205 pounds.  She had good muscle tone and strength, and good ranges of motion of her joints.  Straight-leg-raising was negative.  Dr. Webster found no evidence of neurologic dysfunction to explain Werthy's neck and low back pain following her "minuscule trauma many, many years ago[.]"  (A.R. 595)  She found no objective evidence of "any disability in her standing, walking, sitting, lifting, carrying, hearing, speaking, handling objects, or her ability to travel.  The doctor further noted there was "some question about [Werthy's] mental status."  (*Id.*)

On April 23, 2004, psychologist Dorothy Anderson, Ph.D. reviewed the record and completed a Psychiatric Review Technique form (A.R. 402-15), and a Mental Residual Functional Capacity Assessment form (A.R. 416-19).  She opined Werthy would have mild functional limitations in restriction of the activities of daily living and difficulties in maintaining social functions, and moderate functional limitations in her ability to maintain concentration, persistence, or pace.  (A.R. 412)  She opined Werthy

13 - FINDINGS AND RECOMMENDATIONS

would be moderately limited in her ability to understand, remember, and carry out detailed instructions; to interact appropriately with the general public; and to accept instructions and respond appropriately to criticism from supervisors. She indicated Werthy otherwise would have no significant limitations based on the evidence of record. (A.R. 416-17) She noted Werthy would "require an understanding, supportive supervisor, but not special supervision." (A.R. 418)

On April 27, 2004, a medical consultant (name illegible and specialty unknown) reviewed the record and completed a Residual Physical Functional Capacity Assessment form. (A.R. 420-24) The consultant's findings were consistent with those from Dr. Jensen's February 2003 RFC assessment.

In a "Physical Summary" at the time Werthy's application was reconsidered, Dr. Eder observed the following from the record evidence:

> File back on recon[sideration], [Werthy] alleges neck, back, legs, hands, feet, arms, hips, shoulder pain. She has [degenerative disc disease] in the lumbar and cervical spines. She is obese at 70" 243#, gait is normal, station is normal. On exam she is fairly histrionic, good balance, she has some decreased [range of motion]. She has good muscle bulk, tone and strength. She has good strong abduction at the shoulders, she can squat and recover. Motor strength is 5/5, sensation normal, reflexes are zero at the ankles, the knees, and +1 at the biceps and zero at the triceps. Essentially a normal neuromuscular exam with fairly odd symptoms and positive Waddell sign.[6] She gives a

---

[6]"Waddell's signs were developed to identify psychogenic, or nonorganic, manifestations of pain in patients that may have heightened emotional effects on their condition." *Physiopedia*, http://www.physio-pedia.com/index.php5?title=Waddells_Sign (visited

> totally different account of her [activities
> of daily living] on physical exam compared
> with psych exam where she reports she
> essentially runs the household [and] cares for
> her cousins and her ill mother. Her credi-
> bility is questionable; but we can affirm our
> earlier light RFC.

(A.R. 426)

On July 12, 2005, Werthy saw psychiatrist Nancy Cloak, M.D.

for a comprehensive psychiatric examination. (A.R. 597-601)

Werthy was noted to be "cooperative and a reliable historian."

(A.R. 597) Werthy described her activities of daily living as

follows:

> On a typical day, she will find it very
> difficult[] to get out of bed and to shower,
> but on most days, is able to do the latter.
> This is followed by watching television,
> taking medication, and in the afternoon
> walking with her boyfriend to the park. She
> also participates when she is feeling better
> in housework, meal preparation, and watching
> her young cousins. She is independent with
> respect to meals, finances, shopping, trans-
> portation, and housework. Though she states
> at times her pain interferes with these.

(A.R. 598) Dr. Cloak noted that when Werthy was called from the

waiting area for her appointment, "she moved with a slow, antalgic

gait, and sat stiffly initially. However, as the interview

progressed and she became more involved with her story, much of the

pain behavior disappeared, except that she stood up approximately

20 minutes into the interview, stating that she was uncomfortable

sitting down." (A.R. 599) Werthy was noted to be "quite

preoccupied with her pain." (*Id.*)

_____

Sept. 1, 2011).

15 - FINDINGS AND RECOMMENDATIONS

1  The doctor noted Werthy's "objective presentation was
2  inconsistent with depression, in that both her physical appearance
3  and her bright affect as well as the considerable energy she put
4  into expressing her feelings about her pain, were inconsistent with
5  her history of profound fatigue." (A.R. 600)  The doctor did,
6  however, note objectively that Werthy had difficulty concentrating.
7  She diagnosed Werthy with "Adjustment disorder with depressed mood,
8  chronic"; "Cocaine and alcohol dependence in full sustained
9  remission"; "Pain disorder"; and "Chronic neck and back pain."
10  (*Id.*)  She estimated Werthy's current GAF at 65.[7]  She noted the
11  following conclusion regarding Werthy's mental functional
12  abilities:

> The claimant is capable of managing her Social
> Security funds[, if they are awarded], based
> on generally intact judgment and cognitive
> functioning.  She is capable of understanding
> and remembering instructions, sustaining
> concentration and attention, and engaging in
> appropriate social interactions.  There do not
> appear to be any psychiatric limitations to
> effective job performance, although certain
> tasks may be limited by her chronic pain.

19  (A.R. 600-01)

20  On July 13, 2005, Werthy saw Kim Webster, M.D. for a repeat
21  consultative physical examination.  (A.R. 602-06)  Werthy's chief
22  complaints were noted to be low back pain, neck pain, and diffuse
23  myalgias/arthralgias.  (A.R. 602)  Werthy was noted to have "a very

---

[7]A GAF "between 60 and 70 indicates a patient with 'some mild
symptoms' or 'some difficulty in social, occupational, or school
functioning,' but who is 'generally functioning pretty well, [and]
has some meaningful interpersonal relationships.'"  *Vasquez v.
Astrue*, 572 F.3d 586, 594 n.6 (9th Cir. 2009) (quoting Am. Psych.
Ass'n, *Diagnostic and Statistical Manual of Mental Disorders* at 34
(4th ed. Text Revision 2000).

16 - FINDINGS AND RECOMMENDATIONS

child-like affect and speech pattern." (A.R. 603)  Dr. Webster

noted the following observation of Werthy's behavior during the

examination:

> [S]he would say, "Ouch" probably 2-4 times per
> minute.  This was said with a very flat affect
> with no wincing.  She would say it sitting or
> standing perfectly still and nothing really
> happened, but she would just say "ouch."
> There was a fair amount of pain behavior.
> There were inconsistencies and poor effort.

(*Id.*)  On examination, Werthy was noted to be 70" tall, weighing

243 pounds.  Straight-leg-raising was positive at 30 degrees when

Werthy was supine, but no discomfort at 90 degrees when sitting.

Her ranges of motion were good, gait was normal, and she had fairly

good balance and coordination.  She also had good muscle tone and

strength.  Dr. Webster's assessment was "Low back pain with a

normal neuromuscular examination, fairly odd symptoms, and positive

Waddell sign, strongly suggesting a non-organic cause of pain";

"Neck pain with a normal neuromuscular examination"; "Diffuse

myalgias and arthralgias with a normal musculoskeletal

examination"; "Anxiety"; and "Morbid obesity." (A.R. 605)  The

doctor found "no objective evidence that would limit [Werthy's]

ability to stand, walk, sit, lift, or carry occasionally or

frequently." (*Id.*)  She further found no objective evidence that

Werthy would need an assistive device, or that she would have any

postural, manipulative, or environmental restrictions. (A.R. 605-

06)

On August 10, 2005, psychologist Bill Hennings, Ph.D. reviewed

the record and completed a Psychiatric Review Technique form.

(A.R. 435-48)  His diagnostic impressions included borderline

intellectual functioning, an adjustment disorder, a pain disorder,

17 - FINDINGS AND RECOMMENDATIONS

and a history of drug abuse.  He opined Werthy would have moderate limitations in her ability to maintain social functioning and to maintain concentration, persistence, or pace; and mild limitation in restriction of her activities of daily living.  Dr. Hennings also completed a Mental Residual Functional Capacity Assessment form (A.R. 450-53).  He opined Werthy would be moderately limited in her ability to understand, remember, and carry out detailed instructions; to maintain attention and concentration for extended periods; to interact appropriately with the general public; and to set realistic goals or make plans independently of others.  (*Id.*)  He otherwise found Werthy to have no mental work-related limitations.  (*Id.*)

On August 11, 2005, Martin Kehrli, M.D., a Physical Medicine and Rehabilitation specialist, reviewed the record and completed a Physical Residual Functional Capacity Assessment form.  (A.R. 427-34)  His findings were consistent with prior assessments.  Dr. Kehrli noted the record evidence contains inconsistencies in Werthy's "report of function and noted pain behavior and over dramatized presentation."  (A.R. 432)  He agreed she does have degenerative disc disease of her neck and back, but her report, presentation, and pain behaviors outweigh the overall severity of her condition.  He indicated her ability to perform complex tasks would be affected by her ability to concentrate.  *Id.*

On December 6, 2005, psychologist Paul Rethinger, Ph.D. noted Werthy has "borderline IQs with some depression."  (A.R. 449)  He noted the record evidence indicates Werthy cares for her two younger cousins, shops, cooks, cleans, uses the bus, reads her Bible, assists her ill mother, handles necessary household chores,

18 - FINDINGS AND RECOMMENDATIONS

1   and is independent in caring for herself.  She has "somewhat
2   restricted" short-term memory, but her long term memory is good.
3   *Id.*

4

5   **2.   *Werthy's medical records***

6       The record contains no mention of medical treatment for
7   Werthy's 1993 accident.  Indeed, the earliest treatment notes in
8   the record are from August 5, 1999, when Werthy saw a doctor
9   complaining of numbness along the lateral aspect of her right thigh
10  and calf, going into her foot. She stated the numbness had started
11  about two weeks earlier.  Her other symptoms of pain in her low
12  back, neck, and shoulders were listed as "unchanged" since her last
13  exam.  Notes indicate Werthy "wants disability" for her condition.
14  (A.R. 480) Prescriptions for trazodone and nortriptyline were
15  refilled, and she was started on a trial of 600 mg of Ibuprofen
16  three times daily.  (*Id.*)

17      Werthy was seen on September 9, 1999, complaining of chronic
18  pain with minimal or unchanged neurological symptoms.  Her upper
19  extremity and neck pain were better, but she continued to have low
20  back pain with no radicular symptoms.  She described occasional
21  numbness and tingling.  She stated her pain was "still there," but
22  she was dealing with it better.  She was given refills for
23  trazodone, nortriptyline, and ibuprofen.  (A.R. 478)  In addition,
24  notes indicate Werthy was going to send the doctor her "disability
25  paperwork" for review, but the doctor expressed "doubt [that] she
26  really needs this."  (A.R. 479)

27

28

On October 25, 1999, Werthy was seen for followup of her chronic pain.[8]  She had run out of her medications about a week-and-a-half earlier, and her pain had increased since then.  The doctor noted "no consistent objective neurological [findings,]" but he did note the presence of "multiple tender points throughout." (A.R. 475)  He prescribed trazodone 100 mg and nortriptyline 75 mg at bedtime, and NSAIDS as needed.  (*Id.*)

On December 2, 1999, Werthy was noted to be "much less tender in her prior tender points [and] neurologically normal today." (A.R. 470)  Her chronic pain was "much improved on trazodone and nortriptyline." (*Id.*)  Notes indicate Werthy's pain and depression were well controlled on the medications, but she had flares of pain with associated emotional lability if she went off her medications even for a short time.  Notes further indicate her depression and anxiety had a definite correlation with her chronic pain.  (A.R. 473, 474)

Werthy was seen on January 6, 2000, for followup of her chronic pain.  Notes indicate she was "[a]ctually doing remarkably well and tolerating meds." (A.R. 471)  She was learning to live with her pain and learning coping strategies.  She had begun an exercise program and indicated she might soon have a part-time job. (*Id.*)

---

[8]In many cases, the court is unable to determine who Werthy saw for treatment, or whether the individual was a doctor, physician's assistant, nurse practitioner, or other medical professional.  She often was seen in a multi-disciplinary clinic in the Legacy Health System, and the treating person's name or initials are illegible or nonexistent.

Werthy was seen on April 6, 2000, for followup of her chronic pain. Her condition was noted to be "reasonably stable" and her depression was "well controlled." She stated she wanted to get a job, and she was approved for part-time work with lighter-type duties. Notes indicate Werthy had "learned to live with pain." Her dosage of nortriptyline was increased to 100 mg. (A.R. 464-65) Werthy was seen on April 27, 2000, for followup of her chronic pain. The record does not indicate if, or how, she was treated. (A.R. 463)

On July 31, 2000, Werthy's treating physician's office spoke with her caseworker at "Lifecenter." Notes indicate Werthy had "tried doing simple tasks at Lifecenter - hanging clothes, etc.," but she had multiple pain complaints after a few hours. Her case worker indicated "disability not likely indicated" and "maintaining function is key to management of chronic pain." (A.R. 463) Werthy apparently had been utilizing Lifecenter's services less recently, which was noted to be "possibly a good sign." (*Id.*) Notes further indicate, "doubt there is any indication for . . . disability." (*Id.*)

Werthy was seen on August 8, 2000, with a complaint of back and neck pain, which she stated had been present since 1993. She was seen for followup on August 24, 2000, but notes do not indicate if, or how, she was treated. (A.R. 462) She missed a scheduled appointment on September 7, 2000, when she was scheduled to be seen "for back pain." (*Id.*)

Werthy saw a doctor on October 30, 2000, for followup of a "cracked rib/back/neck injury" from a motor vehicle accident. She had suffered a rib strain after being involved in an alter-

21 - FINDINGS AND RECOMMENDATIONS

cation on October 30, 2000.  Her "chronic pain issues" were noted to be "stable" and she was "functional."  (A.R. 455)  Her medications for chronic pain were continued without change.  (A.R. 456)

On April 2, 2001, Werthy saw a doctor to get established as a new patient.  She completed a "Review of Systems" form on which she indicated she had stress and depression stemming from her ongoing back pain and menstrual bleeding problems, but she had no other health problems or concerns.  (A.R. 512)  Werthy returned for an annual physical examination on May 7, 2001, and her depression was noted to be "stable" on her current medications.  (A.R. 509) Regarding her chronic lower back pain, she was continued on NSAIDS at night, and she was given information on "stretching, back health, [and an] exercise regime[.]"  (A.R. 508)

On October 8, 2001, Werthy saw Robert A. Berselli, M.D., an orthopedic surgeon, for consultation regarding her ongoing neck and back pain.  Notes indicate Werthy was 5'11" tall, and weighed 225 pounds.  Examination revealed some restricted range of motion of her neck in all directions; diffuse tenderness to palpation posteriorly; moderate pain in her lumbar spine on percussion, with mild, diffuse paralumbar muscle spasm, but "no real sciatic notch tenderness" and normal lower extremities neurologically.  (A.R. 566)  The doctor noted, "I am not sure why the patient complains of neck or back pain."  (*Id.*)  He ordered x-rays of Werthy's cervical and lumbar spine, and planned to follow up after they were taken. (*Id.*)

On October 23, 2001, progress notes indicate a phone conversation was had with Werthy "who stated that MRI was not done [because] tech thought she should have 'whole body MRI.'"  (A.R.

22 - FINDINGS AND RECOMMENDATIONS

506)   The doctor's office spoke with the MRI tech, who stated Werthy had never presented for an MRI, at least according to their log.  (*Id.*)  Werthy's MRI was rescheduled for October 29, 2001. (*Id.*)   The MRI showed "[r]elatively advanced degenerative disk disease . . . at L4-L5, where the disk space is narrowed and where the disk material is of lower-than-normal signal intensity, indicating desiccation.  This is associated with a small posterior disk protrusion which indents the anterior aspect of the spinal canal midline and slightly toward the right."  (A.R. 516)

On November 27, 2001, Werthy saw a doctor with continued complaints of near-daily back pain, some days worse than others. The doctor prescribed Relafen, and recommended weight loss and exercise.  (R. 502-03)

Werthy saw a doctor on January 7, 2002, for followup of her chronic pain.  She complained of daily pain that was causing sleeplessness, inability to get into a comfortable position, and mood swings.  Notes indicate an MRI of her lumbar spine showed severe degenerative disc disease with a small disk protrusion.  The doctor prescribed Relafen, stretching, and a weight loss plan. (A.R. 500)  On January 29, 2002, the doctor refilled a prescription for trazodone.  (*Id.*)  On May 21, 2002, a doctor prescribed Tylenol #3 and Relafen.  (A.R. 501)

On June 13, 2002, Werthy saw a doctor complaining of right shoulder pain, right ankle pain with bending, severe back pain that sometimes awakened her at night, and a worsening of her depression symptoms.  The doctor prescribed weight loss, exercise, Bextra, and glucosamine chondroitin.  (*Id.*)

23 - FINDINGS AND RECOMMENDATIONS

Werthy saw a doctor on August 29, 2002, for followup of "chronic arthritis" and "severe back pain." (A.R. 498) She also complained of "chronic depression." (A.R. 499) Werthy stated she had "reached a point where she [could] hardly sit steady for awhile or do any kind of walking or activities because of the excruciating pain that she had into the lower back." (*Id.*) Her pain was localized in her lumbar and lower thoracic spine. Notes indicate a previous CT scan "showed degenerative disk disease with some protrusion of the disk. Even though there was no specific area of compression into the root nerve, the degenerative disk is quite impinged with desiccation of the disk itself, which explain[s] the kind [of pain] that she has with no radiation and with no sciatica." (*Id.*) The doctor prescribed a trial of Bextra, supplemented with Lorcet, and a continuation of trazodone for her depression. She was scheduled for followup in one week, with notes that if she had not improved, a repeat CT would be ordered for possible surgical evaluation. She was given a note directing her to refrain from any kind of physical activity for one week. (*Id.*; A.R. 523)

On September 4, 2002, Werthy saw a doctor for followup of her back and neck pain. She was given samples of Celebrex and Zoloft. (A.R. 497) On September 18, 2002, she returned for followup. The Celebrex, Lorcet, and Zoloft were continued, and Xanax was added for her reported insomnia. In addition, an MRI of Werthy's lumbar spine was ordered. (A.R. 498)

On October 3, 2002, at Werthy's request, she was given a prescription for Valium for her MRI, which was scheduled the next day. A progress note dated October 9, 2002, indicates, "Valium

24 - FINDINGS AND RECOMMENDATIONS

1  didn't work for MRI.  Needs something stronger."  (A.R. 536)
2  Ativan was prescribed.  (*Id.*)  The next note dated October 29,
3  2002, indicates Werthy had called requesting medications again for
4  her MRI.  The request was denied until she could be seen by a
5  doctor.  (*Id.*)

6      Werthy had an MRI on November 21, 2002, that showed "advanced
7  disc degeneration" at L5-S1, with "a mild diffuse disc bulge in
8  conjunction with bilateral marginal spurring.  This extends into
9  the region of the neuroforamina bilaterally but does not appear to
10 be associated with impingement upon the exiting L5 nerve roots."
11 (A.R. 559)  The radiologist also noted "transitional vertebra at
12 the lumbosacral junction considered to be related to partial
13 lumbarization of S1."  (*Id.*)

14     Werthy saw Jencina M. Butler, D.O., a family practitioner, on
15 January 7, 2003, to discuss the results of her MRI.  She stated her
16 back pain was "severe" that morning.  She had been unable to tie her
17 own shoes; she had "irritability" in her legs; and she had "pins
18 and needles" and numbness in her feet. (A.R. 535)  She also had a
19 pins-and-needles sensation in her upper arms.  (*Id.*)  The doctor
20 advised Werthy "that her back pain is now chronic, and stems from
21 arthritis and radiculitis, which do[] not respond well to narcotics
22 (which the patient ha[d] NOT requested)." (A.R. 537)  She gave
23 Werthy a prescription for Neurontin 300 mg at night, noting the
24 dosage could be increased if it was not working.  She recommended
25 gentle exercise such as water aerobics, yoga, or tai chi.  She
26 noted Werthy's pain might increase in the beginning, but likely
27 would decrease as her strength improved, and the exercise also
28 would help her depression.  (*Id.*)

25 - FINDINGS AND RECOMMENDATIONS

Werthy saw Dr. Butler on January 21, 2003, for followup. She reported "some improvement of her pain on Neurontin," and also stated the medication had helped her "leg irritability." (A.R. 533) She reported pain improvement for about eight hours, but no longer. She was "losing sleep as a result of her pain," and requested a prescription for trazodone, which had worked for her in the past. She was exercising gently every day, and stated her mood had improved since she had begun exercising. The doctor increased Werthy's Neurontin dosage to 300 mg three times daily. Werthy was continued on Bextra as needed for "breakthrough pain," and she was given a prescription for trazodone. (*Id.*)

Werthy saw Dr. Butler on June 11, 2003, for followup of her ongoing back pain. She stated Neurontin was not providing her any relief, and she was not sleeping well. She was exercising daily, but had gained seven pounds from "eating more bacon." (A.R. 532) She complained that her depression had been worse over the past two or three months, partly due to her pain and sleep deprivation. Werthy was counseled in "non-pharmacologic methods of pain control, to which she was quite receptive." (*Id.*) The doctor prescribed hydrocodone and trazodone, and directed Werthy to take Tylenol "for controlling the arthritic component of her pain." (*Id.*) She was scheduled to return for followup in one month to evaluate the effectiveness of her medication regimen. (*Id.*)

Werthy saw Dr. Berselli on February 3, 2004, in connection with her application for disability benefits. He ordered x-rays of Werthy's cervical, lumbar, and thoracic spine. (*See* A.R. 585-90, 630-32) He saw Werthy again on February 10, 2004, to review the x-ray findings, noting the following:

26 - FINDINGS AND RECOMMENDATIONS

> The x-rays of the thoracic spine done on the
> 3rd of February seem unremarkable. The films
> of the lumbar spine done on the same date show
> severe degenerative disk disease at L4-5 and
> L5-S1. Finally, the films of the cervical
> spine done on the same date reveal degenera-
> tive disk disease, severe in degree, at C3-4,
> C4-5, and C5-6.

(A.R. 567; *see* A.R. 568-70)

On February 16, 2005, Werthy was admitted to the hospital with pneumonia. She improved quickly on antibiotics and was discharged on February 19, 2005. (A.R. 574-84)

On August 27 and 28, 2005, Werthy was seen for cellulitis of the left leg and an abscess to her left lower extremity, possibly resulting from a spider bite. She was directed to elevate her leg above chest level for three days, rest, refrain from any strenuous activity, and take Ibuprofen for pain. (A.R. 573, 591, 619-22)

The record reflects no doctor visits for two years thereafter. On September 6, 2007, Werthy saw Song Jin Kim, M.D., an Internal Medicine specialist, for a new-patient visit. (A.R. 623-24) Werthy reported that her back and neck pain recently had gotten worse, with pinching and numbness in her hands and legs, and a "lot of pain across her neck and lower hip area just sitting around." (A.R. 623) She also stated she felt depressed, and the pain was causing her not to be as happy as she used to be. Dr. Kim diagnosed Werthy with a depressive disorder with insomnia, for which she prescribed trazodone 50 mg; and lumbago with associated cervicalgia, for which she prescribed vicodin. (AR. 623-24)

Werthy returned to see Dr. Kim on September 20, 2007. She still was having insomnia. She also had suffered a "crushing injury" to her toe, which was treated with a "buddy wrap." On

27 - FINDINGS AND RECOMMENDATIONS

examination, Werthy exhibited tenderness in the trapezius and deltoid areas, and around her scapula on the right. The doctor increased Werthy's trazodone dosage to 150 mg at night. (A.R. 625)

Werthy saw Dr. Kim on November 9, 2007, for followup. She continued to complain of back pain. She was sleeping better, and she had lost fifteen pounds. She was "tearful about the loss of her mother," but she declined a prescription for another anti-depressant. She was directed to continue on her current medications and exercises. (A.R. 626)

On December 24, 2007, Dr. Kim wrote a letter to the state agency regarding Werthy. Dr. Kim stated she had been treating Werthy "for the past few months" for "Lumbago," "Cervicalgia," and "Insomnia - possible." (A.R. 607) She stated Werthy's "physical exam is essentially normal and I don't suspect any vascular or neurologic disorder. However, she is in some musculoskeletal discomfort and she has been attending to this very diligently with some prescription medications and changes in her diet and exercise programs." (*Id.*)

On January 22, 2008, Werthy saw Dr. Kim for followup, and to request assistance with a questionnaire for the doctor's completion in connection with Werthy's application for disability benefits. (A.R. 609-15) Werthy reported that the trazodone was not helping. She stated she had pain doing daily activities, "even just the laundry," and she was "[u]nable to work because of spinal pain . . . [radiating] into her arms and legs." (A.R. 627) The doctor prescribed Fluoxetine 20 mg for depression, and hydrocodone with acetaminophen for pain. (*Id.*)

28 - FINDINGS AND RECOMMENDATIONS

On the questionnaire, Dr. Kim indicated she had been treating Werthy "[a]bout once a month" for "lumbago/depression/cervicalgia." (A.R. 609)  She listed Werthy's symptoms as "feet dull, a lot of pain, neck strain and pain and arm pain," and indicated Werthy's prognosis was "good."  (*Id.*)  She noted tramadol had been ineffective in relieving Werthy's pain and also caused sedation.  The doctor opined Werthy likely would have "substantial difficulty with stamina, pain or fatigue if [she] was working full time, eight hours a day, at the light or sedentary levels of exertion," and she would need to work at a reduced pace.  (*Id.*)  She further opined Werthy's health problems would worsen if she worked full-time. (A.R. 610)  Dr. Kim indicated Werthy is not a malingerer, although emotional factors do contribute to the severity of her symptoms and functional limitations.  (*Id.*)

Dr. Kim opined Werthy could tolerate a low-stress job, noting Werthy "manages family stress ok but [gets] overwhelmed if too much stress."  (A.R. 611)  She noted Werthy requires frequent changes in position "to relieve pain and pressure in her spine."  (*Id.*)  She estimated Werthy would be able to stand and walk for about two hours, and sit for about four hours, in an eight-hour workday.  She could sit for twenty minutes before needing to change positions; stand for ten minutes before changing positions; and she would need to walk around every ten minutes for five minutes each time.  She would need the ability to change positions at will from sitting or standing/walking, and she would need to lie down "every forty min." during a work shift.  The doctor indicated Werthy's x-rays supported her opinions regarding Werthy's limitations.  (A.R. 612)

29 - FINDINGS AND RECOMMENDATIONS

Dr. Kim indicated Werthy should rarely twist, stoop/bend, crouch, or climb stairs, and she should never climb ladders. Werthy could feel and handle without limitation, but she would be limited in her ability to reach, including overhead; finger; and push/pull.  She opined Werthy could lift up to ten pounds occasionally, over ten pounds rarely, and she should never lift over ten pounds.  She based this opinion on Werthy's subjective report that she "gets pain in her arms with weights of 5 pounds." (A.R. 613)  The doctor noted Werthy's symptoms worsen with environmental changes, and Werthy should avoid concentrated exposure to wetness, noise, and fumes/odors/dusts; and even moderate exposure to extremes of hot and cold, and humidity. (A.R. 614)  She indicated Werthy should avoid all exposure to hazards. (*Id.*)  In Dr. Kim's opinion, Werthy would be absent from work more than four times a month due to her impairments or treatment. (*Id.*) She further indicated Werthy had been continuously unable to work since 1993.  (A.R. 615)

Werthy saw Dr. Kim on February 5, 2008, for followup.  Notes indicate she was "[d]oing well with the vicodin and the prozac but still has some difficulty sleeping."  (A.R. 628)  In addition, Werthy had bronchitis.  The doctor prescribed prednisone and an inhaler for the bronchitis, and continued her on the hydrocodone with acetaminophen.  (*Id.*)  These medications were refilled on March 17, 2008.  (A.R. 629)

On July 11, 2008, the ALJ wrote a letter to Dr. Kim requesting clarification as to what appears to be two contradictory opinions. The ALJ noted that in Dr. Kim's letter of December 24, 2007, she expressed the opinion that Werthy "had had a normal physical

30 - FINDINGS AND RECOMMENDATIONS

examination." (A.R. 633)  However, when Dr. Kim completed the questionnaire on January 22, 2008, she opined that Werthy "had significant limits on her activities." (*Id.*)  The ALJ asked the doctor for assistance in understanding the bases of her opinions and how she had arrived at her conclusions regarding Werthy's functional limitations. (*Id.*)  The ALJ requested a response within ten days.  No response from Dr. Kim appears in the administrative record.

### B.  *Summary of the Vocational Evidence*

### 1.  *VE's testimony*

At the ALJ hearing on July 14, 2008, the ALJ asked VE Paul Morrison the following hypothetical question:

> Assume an individual 49 years of age, has completed the eleventh grade, and has a GED. She has also completed EMT training.  I want you to assume that she can sit eight hours in an eight hour day with normal breaks, and the ability to shift positions or to stand.  She can stand and walk four to six hours in an eight hour day, 30 minutes at a time, particularly if she can shift positions as from one leg to another, or taking a step or two. She can lift 10 pounds repeatedly.  She must avoid bending, crouching, kneeling, and crawling.  She also must avoid balancing, unprotected heights, and hazardous machinery. Can you identify any jobs she could perform?

(A.R. 676-77)  The VE responded that the hypothetical individual could work as an electronic assembler or a receptionist, both of which are sedentary, semi-skilled jobs.  She also could work as an addresser, a surveillance system monitor, and a charge account clerk, all of which are sedentary, unskilled jobs. (A.R. 677)  All of the jobs the VE listed would allow the individual to change positions as noted in the ALJ's hypothetical. (A.R. 678)

31 - FINDINGS AND RECOMMENDATIONS

Werthy's attorney asked the VE the following hypothetical question:

> Now let's assume that this person would need
> to work at a reduced work pace if they are
> employed full-time eight hours a day at the
> light or sedentary levels of exertion and,
> based on testimony received and yet to be
> received, let's assume that is half or less of
> a normal person.  Let's assume this person
> would frequently have health symptoms severe
> enough to interfere with attention and concen-
> tration.  This person would be limited to low
> stress jobs.  They would be able to stand and
> walk about six hours with normal breaks during
> an eight hour day, and they would be able to
> sit about four hours with normal breaks during
> an eight hour day.  They  would need, they
> could sit up to 20 minutes at one time before
> changing position, and stand up to 10 minutes
> at one time before changing positions.  They
> would need to walk around about every 10
> minutes, and on these occasions they would
> need to walk around for about 5 minutes.  They
> would need to shift at will from sitting,
> standing, and walking.  This person would need
> to lie down at unpredictable intervals during
> a work shift, and this would happen about
> every 40 minutes.  They could rarely[,]
> meaning 5 percent or less at a time[,] twist,
> stoop, crouch or climb stairs, and never climb
> ladders. They can occasionally lift and carry
> less than 10 pounds and rarely, meaning 5
> percent or less at a time, as much as 10
> pounds.  They should avoid moderate exposure
> to extremes of heat and cold, avoid
> concentrated exposure to wetness, as well as
> noise, fumes, odors, dust and gases.  Avoid
> moderate exposure to humidity, and avoid all
> exposures to hazards such as machinery and
> heights.  This person's health problems are
> such that they could be expected to be absent
> from work more than four times a month.  If we
> were to add those elements to the Judge's
> hypothetical, is it likely that such a person
> could sustain competitive employment in any of
> the jobs you've discussed?

(A.R. 678-79)  The VE responded that the hypothetical individual would be unable to work.

Werthy's attorney asked the VE a second hypothetical question:

32 - FINDINGS AND RECOMMENDATIONS

> Let's add these to the Judge's original hypothetical now, and assume this person has headaches, and these will occur daily or nearly every day, and two or three times a day, and . . . would last for 15 or 20 minutes during which they would not be functional. The crying spells would occur two or three times a day, however, which would tend to last for hours rather than minutes when they would not be functional. This person would have some problems with dizziness, which would occur daily, or nearly every day, and last for about 15 or 20 minutes when they would not be functional. We would have a problem with panic attacks that would occur unpredictably. These could occur up to as often as four times a day when the person would not be functional, and could last for minutes or hours. If we added those elements to the Judge's hypothetical, is it likely that such a person could sustain competitive employment in any of the jobs you've discussed?

(A.R. 679-80)  The VE responded that the individual would be unable to maintain employment.  (A.R. 680)

### 2.   *Third-party evidence*

Werthy apparently attempted to find employment through the State of Oregon's Office of Vocational Rehabilitation.  On June 5, 2008, her voc-Rehab Counselor wrote her a letter stating, "As we discussed in your last appointment we came to the conclusion that your pain is interferring [sic] with you being able to find employment at this time.  Because of this we are closing your file like we had discussed.  Please feel free to reapply whenever you feel like you are able to participate in the vocational activities."  (A.R. 344)

/ / /

/ / /

/ / /

33 - FINDINGS AND RECOMMENDATIONS

1

### C.  *Medical Expert's Testimony*

2       David Ruleman, M.D. testified as a medical expert at the ALJ

3   hearing.  He is board certified in internal medicine.  He has never

4   examined Werthy, but he has reviewed all the medical evidence of

5   record.  He found Werthy to have medically-determinable impairments

6   consisting of neck and low back pain, degeneration of the L5-S1

7   disc space, and "similar abnormalities" in her cervical spine.

8   (A.R. 639)

9       Dr. Ruleman noted that Dr. Webster examined Werthy twice and

10  found no objective findings to support any physical limitations on

11  Werthy's abilities.  (A.R. 640-41)  With regard to Dr. Kim's

12  opinion that Werthy has significant limitations, Dr. Ruleman noted

13  the record did not contain treatment notes from Dr. Kim to support

14  her opinion.[9]   In addition, he indicated her opinion was in

15  conflict with Dr. Webster's 2004 and 2005 examinations of Werthy.

16  (A.R. 640-41)

17      From his examination of the records, Dr. Ruleman opined Werthy

18  would have "some limitations but . . . not sufficient to interfere

19  with many types of work activity."  (A.R. 642)  He opined Werthy

20  would be able to sit for four hours at a time, for a total of eight

21  hours during the workday, "particularly if she has the ability to

22  rise when needed."  (*Id.*)  He opined she could stand for thirty

23  minutes at one time, assuming she could shift her weight from one

24  leg to the other, take a step forward, or similarly shift position.

25  (*Id.*)  If she could alternate sitting and standing, he indicated

26

27      [9]As referenced above in the discussion of Werthy's medical
    records, Dr. Kim's treatment notes do appear in the administrative
28  record.

34 - FINDINGS AND RECOMMENDATIONS

Werthy should be able to stand a total of four hours during the work day. (*Id.*) He further opined Werthy could "[d]efinitely" lift ten pounds repeatedly. She could do reaching, but likely could not perform other postural activities. (A.R. 643) He stated Werthy would have to change positions more than once every two hours. (*Id.*)

### D.  Werthy's Testimony

#### 1.  July 14, 2008, Hearing

Werthy testified to the following facts at the ALJ hearing. She was born in 1959, and was forty-nine years old at the time of the hearing. She lives with David Shea, who has been helping her since her mother died, but he expects to be repaid. She gets food stamps on her own behalf, and she also gets food stamps and medical benefits for her two young cousins, who live with her. Werthy has a G.E.D., and after high school, she completed an EMT course and worked for nearly a year at an ambulance service. (A.R. 665-68) She can read a newspaper and write a letter. To her recollection, she last worked in 1992 or 1993. (A.R. 668)

She first started having problems with headaches within a couple of years after her accident. Her headaches are getting worse as time goes by. She has "pain in [her] head" at least four days out of every week. When she gets a headache, she takes medication, and it is about fifteen to twenty minutes before she gets relief. The headaches interfere with her ability to function. (A.R. 645-46)

She also has arthritis, which began immediately after the accident in 1993. Due to the arthritis, she cannot get around as

35 - FINDINGS AND RECOMMENDATIONS

1  quickly as she used to.  She stated the arthritis is "spreading,"
2  because it originally was only in one leg, but now her other leg is
3  beginning to hurt more.  (A.R. 646)  She also stated her ankles
4  swell up and hurt a couple of times a week.  (A.R. 659)

5      She has a lot of pain in her neck, and she has difficulty
6  raising her head to look up.  When she turns her head from side to
7  side, she hears a cracking noise.  Her legs hurt all the time due
8  to pain radiating from her back.  She also has pain in her feet,
9  and in her arms and hands.  She has pain all day, every day,
10  despite taking medication.  She has to have help carrying
11  groceries, braiding her hair, washing dishes, and other tasks.  She
12  sometimes drops dishes.  She does very little housework.  (A.R.
13  647-48, 660, 662)

14      Werthy stated she has problems with diarrhea that started in
15  about 2005.  She has accidents when she cannot get to a bathroom in
16  time.  She stated she has virtually no advance notice when she is
17  going to have diarrhea, and she frequently has to change her
18  clothes after an attack.  She stated she goes to the bathroom
19  regularly "from seven to ten times a day," and she has to shower
20  and change her clothes "three times a day."  (A.R. 649)  She
21  estimated she would be away from work "maybe 75 percent of the
22  time" because she would be in the bathroom.  (*Id.*)  Upon
23  questioning by the ALJ, Werthy later stated she has not mentioned
24  her diarrhea to any doctor because she has been able to control it
25  by eating cheese.  Now she has diarrhea "every once in awhile . . .
26  [o]ff and on."  (A.R. 669-70)  She also explained that she never
27  mentioned the diarrhea problem to her doctor because she wasn't
28  experiencing diarrhea on the day she saw the doctor.  (A.R. 670-72)

36 - FINDINGS AND RECOMMENDATIONS

She also suffers from depression, which began soon after the 1993 accident.  She no longer likes to leave the house except for doctors' appointments and the like.  She stated she has gained a lot of weight due to the depression.  She also has problems sleeping, getting only a couple of hours of sleep at night.  She gets up four to six times during the night.  She is tired when she gets up in the morning,  She naps frequently during the day for short periods of time, and she also takes a longer nap of at least an hour once a day.  (A.R. 650-51, 658-59)  She also stated depression has affected her energy level, stating, "There is no energy level.  I mean, I have to practically be dragged out of the house now in order to go anywhere, or to even feel like I'm alive again."  (A.R. 651)  Werthy stated she used to be very active and have a lot of interests prior to the accident, but this has changed substantially and "[i]t's been really a different life for [her]." (*Id.*)  She feels guilty because she is unable to do her best due to her constant pain.  She also has problems concentrating.  She can only read for a few minutes at a time before she loses focus or interest.  (A.R. 652, 656)

Werthy also described fits of anger, and frequent panic attacks, often several times a day.  She stated the panic attacks have been getting worse since her mother's death.  When she has a panic attack, it might take her three or four hours to calm down and stop crying "and just feeling worthless."  (A.R. 653-54)  She has crying spells two or three times a day, each lasting "a couple of hours."  (A.R. 655)  During a crying spell, she is "[n]ot very functional at all because [she is] so busy and [she will] be thinking about the pain."  (*Id.*)

37 - FINDINGS AND RECOMMENDATIONS

1    Her fits of anger occur frequently, every day. She stated she

2  has "hollered at [her] friends," and they have asked what was wrong

3  with her because she is not acting like herself. (A.R. 656)

4    A couple of times a week, she also experiences dizziness that

5  lasts for fifteen to twenty minutes. When she has a dizzy spell,

6  she generally takes medication and goes to sleep. (A.R. 655) She

7  stated her pain has gone into her extremities during the last few

8  years and she is "just not the same person as [she] used to be."

9  (A.R. 657) She is "in pain daily all the time, chronic pain all

10  the time and it is getting worse[.]" (*Id.*) Werthy does not

11  believe she will ever be well enough to return to work. (A.R. 658)

12    Werthy estimated she could stand for no more than fifteen

13  minutes before she would need to take a break. She could walk up

14  to two blocks before stopping to rest. She estimated she could be

15  on her feet standing or walking for a total of two hours per day,

16  if she were allowed to take breaks as needed. She stated she could

17  sit in a chair for no more than five to ten minutes before needing

18  a break, and she could sit for a total of "a few hours" if she

19  could take all of the breaks she needed. She indicated that

20  sitting in the chair in the hearing room was causing her pain.

21  (A.R. 660-61) She has problems bending at the waist and kneeling,

22  both of which hurt her back. She would have difficulty crawling

23  due to pain in her knees, back, and neck. (A.R. 661-62) She

24  stated the pace at which she does things has slowed considerably

25  since her accident. She estimated she functions at about 10% of

26  her pre-accident level. (A.R. 662)

27  / / /

28  / / /

38 - FINDINGS AND RECOMMENDATIONS

1    *2.    Personal Pain Questionnaire dated 2/24/04*

2         Werthy completed a "Claimant Pain Questionnaire" in connection

3    with her application.  (A.R. 165-67)  She stated she had aching,

4    stinging pain in her neck and lower back, radiating into her legs,

5    arms, hands, and feet.  She stated she is in pain "all day and

6    night, even when I sleep."  (A.R. 165)  Sitting or standing for too

7    long a time makes the pain worse.  She indicated nothing helps the

8    pain.  She takes Ibuprofen three times a day, "as needed," and she

9    also does some exercise.  (A.R. 166)  She stated she can only be up

10   and active for "15 min., or less" before she has to stop and rest.

11   (*Id.*)  She can start washing dishes or doing laundry, but she

12   cannot finish these tasks.  She used to be able to run, jump, ride

13   horses, wash dishes, do laundry, wash walls, and mop floors, but

14   she is no longer able to do any of these activities.  (*Id.*)  She

15   estimated she can walk one block before she needs to rest.  She

16   sometimes needs assistance tying her shoes or zipping a zipper

17   because of pain in her hands.  She requires assistance with

18   household chores including mopping floors, washing dishes, washing

19   clothes, and making beds.  She uses public transportation when she

20   goes out, but it makes her pain worse so she rarely leaves the

21   house.  She can prepare her own meals using a microwave, but

22   friends also cook for her.  She is unable to engage in any hobbies

23   or pastimes.  (A.R. 167)

24

25   *3.    Activities of Daily Living questionnaire dated 2/24/04*

26        Werthy also completed a form regarding her activities of daily

27   living and socialization.  (A.R. 168-74)  She stated she walks to

28   the bathroom and bedroom, and watches television.  Her mother does

39 - FINDINGS AND RECOMMENDATIONS

all of the housework.  She stated her eating habits have changed since her accident, causing her to gain weight.  She plays cards sometimes, but has no other activities.  She indicated she used to bake cakes, but she no longer does this.

**4.    Function Report dated 5/27/05**

Werthy completed a Function Report providing information about her daily activities and limitations.  She described her daily activities as follows:

> I get up [and] read my bible, take a shower.
> Take my medic[i]ne for the morning, then I
> help my mother with her meds, she have [sic]
> cancer, I cook me something to eat.  I started
> my dinner for the evening when it is done, I
> make the food.  Eat and take a shower and take
> my meds and go to bed.

(A.R. 225)

Werthy stated she does not sleep well because she is in pain all of the time.  It causes her pain to dress herself, to bathe, and to comb her hair.  (A.R. 226)  She prepares her own meals, giving examples of "corn, chicken, rice, spaghetti, hamburgers, fish, [and] sandwiches."  (A.R. 227)  She stated she makes "2 meals daily, 7 meals weekly, 28 meals monthly,"[10] and it takes her three hours to prepare a whole meal.  (*Id.*)  She stated her arms and shoulders hurt when she cooks.  (*Id.*)  She sometimes requires assistance tying her shoes and getting onto a bus, and a friend helps her as needed.  (A.R. 229)

Werthy indicated she does laundry, washes dishes, and combs her hair.  She stated combing her hair takes her about fifteen

---

[10]Needless to say, these numbers are not consistent.

40 - FINDINGS AND RECOMMENDATIONS

minutes.  Someone else braids her hair for her when she wears her hair in braids.  She does laundry every two weeks.  (A.R. 227)  She does not do some housework or yard work because of pain in her back, neck, shoulders, and knees.  She stated she is in pain even when she is asleep, and pain sometimes wakes her up at night.  She leaves the house for an appointment a few times a month, and she starts getting ready an hour beforehand.  (A.R. 228)  When she goes out, she walks and uses public transportation.  (*Id.*)

Werthy stated she shops for food about once a month, usually buying vegetables, milk, bread, canned goods, and eggs.  She is able to pay her own bills, and handle a bank account.  (*Id.*)  Otherwise, she does not go out because if she has to sit or stand for too long, her pain will increase.  (A.R. 229)

She likes to play cards, but stated her hands start hurting, so she will take a break and walk around the block.  She plays cards once a week, and walks around the block three times a week.  She used to enjoy running, riding a bicycle, driving, cooking out, jumping, and riding horses, but she is not able to do those activities anymore due to pain.  She regularly spends time on the telephone with her boyfriend, niece, and sister.  She stated she does not engage in activities because she is "in pain all over." (*Id.*; A.R. 230))

Werthy stated she is in pain with any physical activities such as lifting, squatting, bending, handling, and the like.  She estimated she can walk to the bus, or around the block, which takes five to ten minutes, before she has to rest.  She estimated she can pay attention for fifteen to twenty minutes at a time, and she tries to follow written and oral instructions.  (A.R. 230)  She

41 - FINDINGS AND RECOMMENDATIONS

gets along well with authority figures, and she handles changes in routine well. She will "get touchy with some of [her] family" occasionally when she is under stress. She wears glasses to read. (A.R. 231) Werthy remarked, "I have been in pain for so long, I still have not been helped so I can move on in my life. I hope I can get some help." (A.R. 232)

### E. Third-Party Testimony

Werthy had two witnesses ready to testify on her behalf at the July 14, 2008, ALJ hearing. When Werthy's attorney stated, "I have two more witnesses," the ALJ responded, "Well, you are most welcome to submit statements from them. However, we have another hearing starting at 2:30, and it is now 2:28. All right. This hearing is closed." (A.R. 681)

David Shea wrote a letter stating he has known Werthy for nearly seventeen years. During that time, according to Shea, Werthy lived with her mother, staying with Shea on weekends or when she and her mother would have a falling-out. Shea stated that when Werthy's mother died about three years earlier, the family home was lost and the "two great grand nieces whom she had guardianship [sic] over were under the threat of being taken into foster care and broken up." (A.R. 345) Shea had Werthy and the children move in with him, and he helped her get guardianship of the two girls. He stated, "I have been trying to help her get help getting back to work and then she could pay me back for my incurred cost. Her pain, depression, anger and lack of mental focus has made this impossible." (*Id.*) According to Shea, Werthy is able to walk two to four blocks at a time before she has to rest for at least

42 - FINDINGS AND RECOMMENDATIONS

fifteen minutes.  He stated she is clumsy, and he has "seen her
fall for no reason two time[s] in one month and at least once every
two months regularly."  (A.R. 345-46)  He stated Werthy is unable
to lift dishes up to the top shelf without dropping them.  He has
observed that she takes a lot of pain medication and according to
him, Werthy "is in pain up to 60% of the time."  (A.R. 346)  He
further stated:

> She is fatigued . . . up to 30-60% on bad
> weeks and 15-20% on the good weeks, and this
> is during the productive times of the day.
> When she is able to function it is at 50%
> capacity.  This is accompanyed [sic] by crying
> spells lasting maybe 20 min. at a time 3 times
> a week, or on better weeks 1-2 times a week,
> but it is the anger spells that last more
> often – 2 times a day, 15-20 min. at a time
> spent with repression for hours in between.  I
> don't see how she can get back to work and
> keep gainfull [sic] employment.

(*Id.*)

Quentin Sandvig wrote a letter stating he has known Werthy for
about fifteen years.  He began noticing her health starting to
decline "8 or 9 years ago," with "very visible change in her motion
and mental state" over the last five years.  (A.R. 347)  He stated
Werthy seems to be in pain continually, and she fatigues easily.
She drops things easily and she "becomes frustrated, moody and
blows up in anger."  (*Id.*)  He stated she sometimes breaks down and
cries for hours, or flies into an angry rage.  He estimated Werthy
is angry 60% to 75% of the time.  (A.R. 348)  According to Sandvig,
Werthy cries "on a regular basis, 2-5 times a week."  (*Id.*)  She
calls him regularly and "always seems upset and crying all the
time."  (*Id.*)  He also has noticed that it takes Werthy longer to

43 - FINDINGS AND RECOMMENDATIONS

1  move and walk, and she appears to be "disoriented and tired all the

2  time." (*Id.*)

3      David Shea completed a third-party statement concerning

4  Werthy's activities of daily living, dated November 28, 2001.

5  (A.R. 153-67)  He noted Werthy seemed to be upset frequently from

6  pain, and she became angry much more than previously ("to[]o much

7  in my opinion.").  (A.R. 155)  He indicated Werthy spent her days

8  watching television and sometimes listening to the radio.  She

9  played cards twice a month for one-half hour each time, but she had

10 no other hobbies.  According to Shea, Werthy napped several times

11 a week, for varying lengths of time.  He stated she could prepare

12 hot dogs, but not much else.  She attempted to do housework, but

13 would "go[] down in her back," so Shea did most of the housework.

14 (A.R. 160-61)  Shea opined Werthy might be able to learn to type

15 with help, but she would need a back support to sit for any length

16 of time.  (A.R. 163)

17     Shea completed a similar form on November 6, 2002.  (A.R. 122-

18 33)  He stated Werthy was argumentative when she was depressed.

19 She could prepare hot dogs, and would do dishes every few days.

20 She had no hobbies or activities, and spent no time with friends

21 except Shea.  Shea observed that when Werthy's medication wears

22 off, her pain increases.  He described her usual daily activities

23 as watching television, taking her medications, calling doctors,

24 and fixing hot dogs.  (A.R. 122-33)

25     On June 22, 2005, Werthy's mother, Darlean Mathews, completed

26 a Function Report - Adult - Third Party.  (A.R. 194-201)  Mathews

27 stated Werthy spent her days watching television, fixing food to

28 eat, taking a shower, and taking medicine.  She helped her mother

44 - FINDINGS AND RECOMMENDATIONS

with home care when she was able.   Werthy could perform her own personal care tasks, but she sometimes would need help tying her shoelaces.   Mathews stated Werthy would cook a couple of times a day, and she tended to burn herself more than she used to. According to Mathews, Werthy was unable to do many household chores because of pain in her hand.   She estimated Werthy might spend about forty-five minutes a day doing housework, "if her hand and legs stop hurting."  (A.R. 196)  She stated Werthy is in pain all the time, and sometimes Werthy cries herself to sleep.   She estimated Werthy could walk about two blocks before she would have to stop and rest for fifteen to twenty minutes.  (A.R. 194-201)

Mathews completed a similar report on February 24, 2004. (A.R. 175-83)  She indicated she sometimes had to help Werthy tie her shoes.   She described Werthy's daily activities similar to her 2005 description; i.e., watching television, taking her medica-tions, attempting to do light housework, taking a shower.   Mathews indicated Werthy did not sleep well at night.   She stated Werthy took care of most of her personal care, but it caused her pain to bathe, dress, and use the toilet.   She stated Werthy could not care for her hair without assistance. At that time, in 2004, she stated Werthy did no food preparation at all.   She used to cook daily, but according to Mathews, cooking now caused her too much pain. Mathews listed a number of activities Werthy used to enjoy that she no longer was able to do, and she stated basically Werthy is in pain all of the time.  (*Id.*)

/ / /

/ / /

/ / /

45 - FINDINGS AND RECOMMENDATIONS

1        ***III.   DISABILITY DETERMINATION AND BURDEN OF PROOF***

2    ***A.   Legal Standards***

3        A claimant is disabled if he or she is unable to "engage in

4    any substantial gainful activity by reason of any medically

5    determinable physical or mental impairment which . . . has lasted

6    or can be expected to last for a continuous period of not less than

7    12 months[.]"  42 U.S.C. § 423(d)(1)(A).

8        "Social Security Regulations set out a five-step sequential

9    process for determining whether an applicant is disabled within the

10   meaning of the Social Security Act."  *Keyser v. Commissioner*, ___

11   F.3d ___, 2011 WL 2138237, at *3 (9th Cir. June 1, 2011) (citing 20

12   C.F.R. § 404.1520).  The Keyser court described the five steps in

13   the process as follows:

14           (1) Is the claimant presently working in a
             substantially gainful activity?  (2) Is the
15           claimant's impairment severe?  (3) Does the
             impairment meet or equal one of a list of
16           specific impairments described in the regula-
             tions?  (4) Is the claimant able to perform
17           any work that he or she has done in the past?
             and (5) Are there significant numbers of jobs
18           in the national economy that the claimant can
             perform?
19
20   *Id.* (citing *Tackett v. Apfel*, 180 F.3d 1094, 1098-99 (9th Cir.

21   1999)); *see Bustamante v. Massanari*, 262 F.3d 949, 953-54 (9th Cir.

22   2001) (citing 20 C.F.R. §§ 404.1520 (b)-(f) and 416.920 (b)-(f)).

23   The claimant bears the burden of proof for the first four steps in

24   the process.  If the claimant fails to meet the burden at any of

25   those four steps, then the claimant is not disabled.  *Bustamante*,

26   262 F.3d at 953-54; *see Bowen v. Yuckert*, 482 U.S. 137, 140-41, 107

27   S. Ct. 2287, 2291, 96 L. Ed. 2d 119 (1987); 20 C.F.R.

28   §§ 404.1520(g) and 416.920(g) (setting forth general standards for

46 - FINDINGS AND RECOMMENDATIONS

evaluating disability); 404.1566 and 416.966 (describing "work which exists in the national economy"); 416.960(c) (discussing how a claimant's vocational background figures into the disability determination).

The Commissioner bears the burden of proof at step five of the process, where the Commissioner must show the claimant can perform other work that exists in significant numbers in the national economy, "taking into consideration the claimant's residual functional capacity, age, education, and word experience." *Tackett v. Apfel*, 180 F.3d 1094, 1100 (9th Cir. 1999). If the Commissioner fails meet this burden, then the claimant is disabled, but if the Commissioner proves the claimant is able to perform other work which exists in the national economy, then the claimant is not disabled. *Bustamante*, 262 F.3d at 954 (citing 20 C.F.R. §§ 404.1520(f), 416.920(f); *Tackett*, 180 F.3d at 1098-99).

The ALJ determines the credibility of the medical testimony and also resolves any conflicts in the evidence. *Batson v. Comm'r*, 359 F.3d 1190, 1196 (9th Cir. 2004) (citing *Matney v. Sullivan*, 981 F.2d 1016, 1019 (9th Cir. 1992)). Ordinarily, the ALJ must give greater weight to the opinions of treating physicians, but the ALJ may disregard treating physicians' opinions that are "conclusory, brief, and unsupported by the record as a whole, . . . or by objective medical findings." *Id.* (citing *Matney, supra*; *Tonapetyan v. Halter*, 242 F.3d 1144, 1149 (9th Cir. 2001)). If the ALJ disregards a treating physician's opinions, "'the ALJ must give specific, legitimate reasons'" for doing so. *Id.* (quoting *Matney*).

The ALJ also determines the credibility of the claimant's testimony regarding his or her symptoms:

47 - FINDINGS AND RECOMMENDATIONS

> In deciding whether to admit a claimant's
> subjective symptom testimony, the ALJ must
> engage in a two-step analysis. *Smolen v.*
> *Chater*, 80 F.3d 1273, 1281 (9th Cir. 1996).
> Under the first step prescribed by *Smolen*,
> . . . the claimant must produce objective
> medical evidence of underlying "impairment,"
> and must show that the impairment, or a combi-
> nation of impairments, "could reasonably be
> expected to produce pain or other symptoms."
> *Id.* at 1281-82. If this . . . test is satis-
> fied, and if the ALJ's credibility analysis of
> the claimant's testimony shows no malingering,
> then the ALJ may reject the claimant's testi-
> mony about severity of symptoms [only] with
> "specific findings stating clear and con-
> vincing reasons for doing so." *Id.* at 1284.

*Batson*, 359 F.3d at 1196.

## B.   *The ALJ's Decision*

The ALJ first discussed the appropriate date for consideration of Werthy's claimed disability. Although Werthy claims she became disabled in 1993, the ALJ observed that the earliest medical evidence of record is from July 1999. Thus, the ALJ held, disability, or even the severity of Werthy's impairments, cannot be determined prior to that date. (A.R. 20)

In addition, the ALJ noted Werthy had filed an application for SSI only. Because SSI regulations do not provide for retroactive payments, the ALJ limited discussion of Werthy's medical problems to the period beginning on the date she filed her application; i.e., April 22, 2005. (*Id.*)

The ALJ found Werthy has not engaged in substantial gainful activity since April 22, 2005. She found Werthy's neck and back pain to be a "severe combination of impairments." (A.R. 20) She further found Werthy's "diarrhea; sleep disturbance; borderline intellectual functioning/organic brain syndrome; history of

48 - FINDINGS AND RECOMMENDATIONS

substance abuse in long term sustained remission; depression; headaches; loss of concentration; panic attacks; dizziness; and anger; and obesity," to be non-severe impairments. (*Id.*) She found that none of Werthy's impairments, either singly or in combination, meet the Listing level of severity. (A.R. 22)

The ALJ found Werthy to have the following residual functional capacity:

> [T]he claimant has the residual functional capacity to perform light work as defined in 20 CFR 416.967(b). This capacity is modified. The claimant is able to sit 8 hours out of 8 hours with normal breaks as long as she can alternate between sitting and standing when necessary. The claimant can stand a total of 4 to 6 hours per 8 hour day for 30 minutes at one time if she can shift positions, from one leg to the other or take a step or two. The claimant is able to lift 10 pounds repeatedly, but must avoid bending, crouching, kneeling, crawling, balancing, as well as exposure to unprotected heights, and hazardous machinery.

(A.R. 23)

The ALJ found Werthy's back and neck pain reasonably could be expected to produce the symptoms she alleges, but she further found Werthy's subjective complaints regarding her symptoms not to be fully credible. She found that the medical records undermined Werthy's testimony, which she found to be "internally incon-sistent." (A.R. 24) In support of this finding, the ALJ noted the following:

• Although Werthy testified she had not worked since 1993, she told Dr. Kim on September 6, 2007, that she "used to work with her mother as care taker when mother was alive; mother died in 2005 and then that source of income went away[.]" (A.R. 24, 623) On November 9, 2007, Dr. Kim noted she was "tearful

49 - FINDINGS AND RECOMMENDATIONS

about the loss of her mother and how her family has taken advantage of her, especially in regards to stealing her inheritance - a house that she and her mother worked at to make into a business." (A.R. 24, 626)   The ALJ found these statements indicated Werthy had been "less than truthful about her work activity and her capacity to function." (A.R. 24)

- Werthy testified she would be away from work 75% of the time because she would be in the bathroom with diarrhea, which caused her to need to shower and change clothes frequently. Yet Werthy failed to even mention diarrhea to her treating physicians other than a single notation in 2001. The ALJ further noted that in 2003, Werthy's treating physician at the time listed "chronic lumbar pain," insomnia, and depression as Werthy's complaints, with "no reference to the headaches [Werthy] has supposedly had since 1995, to any upper body or neck problem, to pain in her legs, or to incontinence." (*Id.*)

- Werthy testified her physical problems are getting worse, yet Dr. Kim indicated Werthy does not have a condition that would tend to degenerate or deteriorate over time. (A.R. 25, citing A.R. 609, ¶ 8).   In addition, the ALJ found the medical records failed to show any significant increase in Werthy's symptoms over time.   (A.R. 25)

- The ALJ found Werthy's "litany of complaints and described daily inability to function [to be] radically different than how she described her activities and symptoms when she completed a function report dated May 25, 2005 [A.R. 225-32]." The ALJ noted at that time, Werthy was caring for her mother who had cancer, and her two young cousins, and doing all of

the household chores and grocery shopping.  The ALJ noted, "Although the claimant described pain in her back, legs, and arms, it did not prevent her from independently performing these activities." (*Id.*)

•   The consulting psychiatrist who examined Werthy on July 12, 2005, noted she was "independent with respect to meals, finances, shopping, transportation, and housework." (*Id.*, citing A.R. 597-601[11])  In addition, Werthy told the doctor that her typical day included walking to the park with her boyfriend - an activity the ALJ found in conflict with Werthy's testimony of "only being able to walk 2 blocks." (*Id.*)

•   The ALJ noted "the source of Werthy's back pain is congenital," yet this impairment "did not prevent her from doing the strenuous work of an EMT or the physically demanding work of a home health care aide." (*Id.*)  She found no evidence in the record to support Werthy's claim that her symptoms worsened after her mother's death in 2005, noting Werthy was only taking over-the-counter anti-inflammatory medications at that time. (*Id.*)

The ALJ gave little weight to "the recently submitted July 2008 statements, allegedly by Quentin Sandvig and David Shea." She found the handwriting on the two statements to be "remarkably similar as if the same person wrote these brief statements." (*Id.*) She further found that both witnesses had "describe[d] a

---

[11]The ALJ erroneously listed "Ex. 27F" in support of this statement.  Dr. Cloak's report actually is Exhibit 26F, pages 597-601 of the Administrative Record.

51 - FINDINGS AND RECOMMENDATIONS

deterioration in the claimant's health which is not reflected any where else in the hearing record." (*Id.*)

The ALJ also did not give full weight to all of Dr. Kim's opinions regarding Werthy's functional limitations. She noted Dr. Kim had not performed a nerve conduction study to verify any problems with Werthy's arms and hands, and her opinion overall was inconsistent with her own records and the balance of the medical evidence. The ALJ gave 'some weight" to her opinion that Werthy suffers from "some musculoskeletal discomfort," but no weight to the balance of her opinions. (A.R. 26)

The ALJ gave no weight to the letter from Werthy's vocational rehabilitation counselor, indicating Werthy's file was being closed because her "pain was interfering with her being able to find employment." (*Id.*, citing A.R. 344) She noted the action was taken "apparently based solely on [Werthy's] complaints." (*Id.*)

Regarding Werthy's complaint that she suffers from depression, which affects her ability to concentrate and to work full time, the ALJ noted Werthy had never sought mental health treatment. She noted Werthy had "taken Trazodone to improve her sleep but it was not until January 2008 that she was prescribed an anti-depressant, Prozac[.]" (*Id.*) Two examining mental health professionals had found Werthy not to suffer from symptoms that would prevent her from working. The one non-examining psychologist, Bill Hennings, who opined Werthy would be "moderately limited in her ability to understand, to persist, to socially interact, and to adapt to changes[,]" failed to provide any basis for his opinion. (*Id.*, citing A.R. 450-53) The ALJ therefore gave Dr. Hennings's opinion "no evidentiary weight." (*Id.*)

52 - FINDINGS AND RECOMMENDATIONS

1  The ALJ concluded Werthy could not return to her past relevant
2  work as a home care giver, which requires a medium exertional
3  capacity.  Relying on the VE's testimony, the ALJ found Werthy is
4  "capable of making a successful adjustment to other work that
5  exists in significant numbers in the national economy," giving
6  examples of electronic assembler, receptionist, addresser,
7  surveillance systems monitor, and charge account clerk.  (A.R. 27)
8  The ALJ therefore found Werthy not to be disabled.  (A.R. 27-28)
9
10                    *IV.  STANDARD OF REVIEW*
11      The court may set aside a denial of benefits only if the
12  Commissioner's findings are "'not supported by substantial evidence
13  or [are] based on legal error.'"  *Bray v. Comm'r*, 554 F.3d 1219,
14  1222 (9th Cir. 2009) (quoting *Robbins v. Soc. Sec. Admin.*, 466 F.3d
15  880, 882 (9th Cir. 2006)); *accord Black v. Comm'r*, slip op., 2011
16  WL 1930418, at *1 (9th Cir. May 20, 2011).  Substantial evidence is
17  '"more than a mere scintilla but less than a preponderance; it is
18  such relevant evidence as a reasonable mind might accept as
19  adequate to support a conclusion.'"  *Id.* (quoting *Andrews v.*
20  *Shalala*, 53 F.3d 1035, 1039 (9th Cir. 1995)).
21      The court "cannot affirm the Commissioner's decision 'simply
22  by isolating a specific quantum of supporting evidence.'"  *Holohan*
23  *v. Massanari*, 246 F.3d 1195, 1201 (9th Cir. 2001) (quoting *Tackett*
24  *v. Apfel*, 180 F.3d 1094, 1097 (9th Cir. 1998)).  Instead, the court
25  must consider the entire record, weighing both the evidence that
26  supports the Commissioner's conclusions, and the evidence that
27  detracts from those conclusions.  *Id.*  However, if the evidence as
28  a whole can support more than one rational interpretation, the
53 - FINDINGS AND RECOMMENDATIONS

1  ALJ's decision must be upheld; the court may not substitute its

2  judgment for the ALJ's. *Bray*, 554 F.3d at 1222 (citing *Massachi v.*

3  *Astrue*, 486 F.3d 1149, 1152 (9th Cir. 2007)).

4

5                              *V.   DISCUSSION*

6                  *A.   Severity of Werthy's Impairments*

7       Werthy first argues the ALJ erred in finding that her depres-

8  sion, borderline intellectual functioning, insomnia, diarrhea,

9  headaches, and "feet, arm & hand limitations" were not "severe"

10  impairments as defined by the regulations.  Dkt. #15, pp. 21-26.

11  An impairment is considered "severe" if it "significantly limits [a

12  claimant's]   physical   or   mental   ability   to   do   basic   work

13  activities[.]"  20 C.F.R. §§ 416.920(c).  "Basic work activities"

14  are "the abilities and aptitudes necessary to do most jobs."   20

15  C.F.R. §§ 416.921(b).  The regulations give examples of basic work

16  activities including "Physical functions such as walking, standing,

17  sitting,   lifting,   pushing,   pulling,   reaching,   carrying,   or

18  handling";   "Capacities   for   seeing,   hearing,   and   speaking";

19  "Understanding, carrying out, and remembering simple instructions";

20  "Use of judgment"; "Responding appropriately to supervision, co-

21  workers and usual work situations"; and "Dealing with changes in a

22  routine work setting." *Id.*  Werthy claims the ALJ's rejection of

23  her impairments as "non-severe" is not supported by substantial

24  evidence in the record.

25

26  *1.    Depression & Borderline Intellectual Functioning*

27       Werthy argues the ALJ erred in adopting the conclusion of

28  examining psychiatrist Dr. Cloak that "[t]here do not appear to be

54 - FINDINGS AND RECOMMENDATIONS

any psychiatric limitations to effective job performance, although certain tasks may be limited by her chronic pain." (A.R. 601) Werthy argues that "multiple other physicians" treated her for depression, and two consultative examiners, Dr. Powell and Dr. Brown, both diagnosed her with depression and borderline intellectual functioning ("BIF"). She argues the ALJ failed to address those opinions, and the treatment notes regarding her depression. Dkt. #15, pp. 22-23. Werthy further notes Dr. Powell concluded from his testing that she has well below average IQ scores, and deficits in concentration and arithmetic. *Id.*, p. 23. She argues the record evidence of her ongoing treatment for depression, coupled with the consultative examiners' and nonexamining consultants' findings that she has depression and BIF, as well as moderate limitations, "negate the ALJ's conclusion that Dr. Kim's opinions are contradicted by other physicians[.]" *Id.*

The Commissioner notes Dr. Powell recommended Werthy pursue work activity. However, Dr. Powell also observed, "It is likely that symptoms of depression may interfere [with Werthy's ability to work] in the sense that she may struggle to have an adequate level of drive in pursuing activities that would help her be more inde-pendent." (A.R. 494) He further noted it could take Werthy six to twelve months before she could maintain employment due to "the length of time that she has been away from employment and the combination of physical and medical symptoms and symptoms of depression present[.]" *Id.*

Non-examining consultants found moderate limitations based on Werthy's depression and borderline intellectual functioning on December 3, 2001 (A.R. 355-58); September 16, 2002 (A.R. 380-93);

55 - FINDINGS AND RECOMMENDATIONS

and December 6, 2005 (A.R. 449). Examining consultants similarly diagnosed Werthy with depression and BIF on August 18, 2001 (A.R. 492); November 12, 2002 (A.R. 528); and April 7, 2004 (A.R. 600).

On December 2, 1999, Werthy's then-treating physician noted that her depression and anxiety were well-controlled on medication, and had a definite correlation with her chronic pain. (A.R. 473, 474) On April 6, 2000, notes continue to indicate her depression was well-controlled. (A.R. 464-65) On April 2, 2001, Werthy saw a doctor to get established as a new patient. She completed a "Review of Systems" form on which she indicated she had stress and depression stemming from her ongoing back pain and menstrual bleeding problems, but she had no other health problems or concerns. (A.R. 512) Werthy returned for an annual physical examination on May 7, 2001, and her depression was noted to be "stable" on her current medications. (A.R. 509)

When Werthy saw Dr. Powell in August 2001, she stated she had suffered from depression "real bad" for two years, describing symptoms of excessive sleeping, increased irritability, and "a bad attitude." (A.R. 486) Dr. Powell concluded Werthy's symptoms were consistent with at least a moderate level of clinical depression, secondary to her physical pain. (A.R. 493) Werthy saw a doctor on June 13, 2002, complaining that her depression had worsened. (A.R. 501) On August 29, 2002, she continued to complain of "chronic depression." (A.R. 499) At a consultative examination on November 12, 2002, Dr. Brown diagnosed Werthy with depression. (A.R. 528) Werthy saw Dr. Butler on June 11, 2003, complaining that her depression had been worse over the past two or three months, partly due to her pain and sleep deprivation. (A.R. 532)

56 - FINDINGS AND RECOMMENDATIONS

When Werthy saw Dr. Kim on September 6, 2007, to establish as a new patient, she reportedly felt depressed, and stated her pain was causing her not to be as happy as she used to be. Dr. Kim diagnosed Werthy with a depressive disorder with insomnia, for which she prescribed trazodone 50 mg (A.R. 623-24).

Thus, the record evidence establishes that Werthy has been treated for depression since at least 1999, and the consultative examiners diagnosed her with depression. In addition, treatment notes are contrary to the ALJ's finding that Werthy has "taken Trazadone [sic] to improve her sleep but it was not until January 2008 that she was prescribed an anti-depressant." (A.R. 26) Werthy's doctors repeatedly noted they were prescribing Trazodone for her depression, and both the Physicians' Desk Reference and innumerable online sources indicate that Trazodone is prescribed for the treatment of major depressive disorder. *See, e.g.*, www.rxlist.com/oleptro-drug.htm (providing information on Trazodone hydrochloride extended release tablets marketed under the name "Oleptro"); www.ncbi.nlm.nih.gov/pubmedhealth/PMH0000530/ (a web site maintained by the National Institutes of Health, stating "Trazodone is used to treat depression.").

Nevertheless, the treatment notes indicate Werthy's symptoms of depression have been, for the most part, well controlled with medication. Her treating sources did not urge her to undergo psychotherapy or counseling for depression, merely continuing to prescribe antidepressant medications themselves. The record contains substantial evidence to support the ALJ's finding that Werthy's mental impairments are not severe.

/ / /

57 - FINDINGS AND RECOMMENDATIONS

*2.   Insomnia*

The ALJ noted Werthy "has complained of sleep disturbance and her physician has diagnosed insomnia[.]" (A.R. 21)  However, she found Werthy's insomnia not to be severe, noting that Werthy has been receiving treatment for the condition "and has reported that she sometimes gets up but is able to return to sleep." (*Id.*) Werthy argues the ALJ's conclusion that just because she *sometimes* can return to sleep does not mean her insomnia would have no more than a minimal effect on her ability to work.  She argues that in so finding, the ALJ essentially made her own independent medical finding, something an ALJ is not permitted to do.  Dkt. #15, p. 24 (citing *Rohan v. Chater*, 98 F.3d 966, 970 (7th Cir. 1996)).  She argues the ALJ failed to discuss her testimony and medical records regarding her fatigue, and her need for frequent rest breaks and naps.  *Id.*

On January 7, 2002, Werthy saw a doctor complaining that her daily pain was causing sleeplessness.  (A.R. 500)  On September 4, 2002, she was prescribed medication for insomnia.  (A.R. 498)  On January 21, 2003, she complained that she was "losing sleep as a result of her pain." (A.R. 533)  She complained that she was not sleeping well on June 11, 2003, and her sleep deprivation was making her depression worse.  (A.R. 532)  On September 6, 2007, Dr. Kim diagnosed Werthy with a depressive disorder with insomnia. (A.R. 623-24)

Thus, there is no record evidence of Werthy's insomnia from June 2003 until September 2007.  Further, the record evidence does not establish that the problem was "severe."  The court finds the ALJ did not err in concluding Werthy's insomnia was not severe.

### 3.   Diarrhea and Headaches

Werthy argues that in dismissing these impairments as non-severe due to a lack of treatment notes, the ALJ ignored Werthy's testimony that she could not afford to see a doctor for her diarrhea, and she did, in fact, complain of headaches to Dr. Kim. Dkt. #15, p. 24. Little discussion is required with regard to these impairments. When Werthy saw Dr. Powell for evaluation in August 2001, she stated she had four or more headaches a week. (A.R. 486) In her hearing testimony, she again stated she has headaches about four times a week, and her headaches have worsened since her mother's death in 2005. She also stated, however, that her headaches are under control within fifteen to twenty minutes after she takes medication. (A.R. 645-46)

Other than these instances, there is nothing in the record about Werthy's headaches. The court finds the record does not contain substantial evidence that Werthy's headaches constituted a severe impairment, and the ALJ did not err in finding the impairment not to be severe.

Regarding her diarrhea, the *only* record evidence is Werthy's testimony about her frequent problems. The ALJ observed, and the court agrees, that Werthy's own testimony was internally inconsistent regarding this impairment, and the court finds the ALJ did not err in finding Werthy's diarrhea not to be a severe impairment.

### 4.   Feet, Arm, & Hand Limitations

Werthy argues the ALJ "ignores the fact that a severity determination is not determined by exclusively examining objective evidence." Dkt. #15, p. 25 (citing *Smolen v. Chater*, 80 F.3d 1273

59 - FINDINGS AND RECOMMENDATIONS

1   (9th Cir. 1996)).  She further argues the ALJ erred in failing to
2   consider whether her severe degenerative disk disease would cause
3   pain radiating into her limbs.  She notes the ALJ acknowledged
4   Dr. Ruleman's testimony that she would have limits on the use of
5   her feet, arms, and hands, and Dr. Kim's opinion that she would
6   have limitations.  *Id.* (citing A.R. 21)  Werthy argues the ALJ
7   improperly rejected Dr. Ruleman's testimony.  *Id.*

8       Dr. Ruleman opined Werthy could "[d]efinitely" lift ten pounds
9   repeatedly.  She could do reaching, but likely could not perform
10  other postural activities.  (A.R. 643)  Dr. Kim stated Werthy had
11  pain in her arms and feet.  (A.R. 609)  She opined Werthy would be
12  able to feel and handle without limitations, but would be limited
13  in her ability to reach, finger, and push/pull.  She also opined
14  Werthy could lift up to ten pounds occasionally, over ten pounds
15  rarely, and she should never lift over ten pounds.  However, from
16  Dr. Kim's treatment notes, it appears she based her opinion
17  regarding Werthy's lifting limitation on Werthy's subjective report
18  that she "gets pain in her arms with weights of 5 pounds."  (A.R.
19  613)

20      Although the record contains some evidence regarding
21  limitations in Werthy's feet, arms, and hands, there is not
22  substantial evidence to support a finding that these impairments
23  are severe, to the extent they would significantly limit Werthy's
24  ability to do basic work activities.  The court finds the ALJ did
25  not err in finding these impairments not to be severe.
26  / / /
27  / / /
28  / / /

60 - FINDINGS AND RECOMMENDATIONS

1

### B.  *Residual Functional Capacity Determination*

2    Werthy next argues the ALJ erred in failing to follow Social

3 Security Ruling ("SSR") 96-8p, requiring consideration of *all* of

4 Werthy's impairments, including those the ALJ found not to be

5 severe, in determining Werthy's residual functional capacity

6 ("RFC").  She further argues the ALJ failed to follow the SSR by

7 considering and addressing all of the medical opinions. Specifi-

8 cally, Werthy asserts the ALJ failed to address Dr. Powell's

9 diagnosis of a pain disorder, and the ALJ erred in rejecting

10 Dr. Kim's opinions without providing specific reasons for doing so.

11 Dkt. #15, pp. 26-28.

12    SSR 96-8p sets forth "the Social Security Administration's

13 policies and policy interpretations regarding the assessment of

14 [RFC] in initial claims for disability benefits under titles II and

15 XVI of the Social Security Act[.]"  SSR 96-8p (July 2, 1996).  The

16 RFC assessment "is an administrative finding of fact."  *Id.* n.4.

17 The ruling explains that ordinarily, the RFC assesses the *most* a

18 claimant can do despite her limitations or restrictions, con-

19 sidering her ability "to do sustained work-related physical and

20 mental activities in a work setting on a regular and continuing

21 basis . . . mean[ing] 8 hours a day, for 5 days a week, or an

22 equivalent work schedule."  *Id.*  The RFC is based solely on the

23 individual's medically-determinable impairments.  *Id.*

24    In the Policy Interpretation statement following the ruling,

25 the Agency explains:

26
27
28

> The adjudicator must consider all allegations of physical and mental limitations or restric- tions and make every reasonable effort to ensure that the file contains sufficient evidence to assess RFC.  Careful consideration

61 - FINDINGS AND RECOMMENDATIONS

> must be given to any available information
> about symptoms because subjective descriptions
> may indicate more severe limitations or
> restrictions than can be shown by objective
> medical evidence alone.
>
> In assessing RFC, the adjudicator must
> consider limitations and restrictions imposed
> by all of an individual's impairments, even
> those that are not "severe." While a "not
> severe" impairment(s) standing alone may not
> significantly limit an individual's ability to
> do basic work activities, it may – when
> considered with limitations or restrictions
> due to other impairments – be critical to the
> outcome of a claim. For example, in combina-
> tion with limitations imposed by an indi-
> vidual's other impairments, the limitations
> due to such a "not severe" impairment may
> prevent an individual from performing past
> relevant work or may narrow the range of other
> work that the individual may still be able to
> do.

*Id.*

"The RFC determination is based on 'all of the relevant medical and other evidence,' including any statements about what the claimant can still do provided by medical sources, whether based on a formal medical examination or not, and descriptions and observations of a claimant's limitation from his or her impairments provided by the claimant or his or her family, neighbors, and friends." *Beeson v. Astrue*, slip op., No. CV-09-1403-ST, 2011 WL 530794, at *7 (D. Or. Jan. 6, 2011) (quoting 20 C.F.R. § 416.945(a)(3); citing SSR 96-8p).

A reviewing court will affirm an ALJ's RFC determination "if the ALJ applied the proper legal standard and the decision is supported by substantial evidence." *Bayliss v. Barnhart*, 427 F.3d 1211, 1217 (9th Cir. 2005); *accord Frampton v. Astrue*, slip op., No. CV 08-14-00-PK, 2010 WL 373867, at *14 (D. Or Jan. 29, 2010) (Mosman, J.). Here, although the ALJ explained why she found

62 - FINDINGS AND RECOMMENDATIONS

1  several of Werthy's impairments not to be severe, there is no
2  indication she considered all of Werthy's impairments, even those
3  that are not "severe," in formulating her RFC assessment.  Con-
4  sidered together, the impact of all Werthy's impairments on her
5  ability to sustain gainful employment could be much greater than
6  the impact of only her severe impairments.

7      Furthermore, the court finds the ALJ's treatment of the
8  handwritten statements from Werthy's two third-party witnesses to
9  be inappropriate in the context of this case.  First, the ALJ
10 refused to allow Werthy's two witnesses, who were present and
11 available at the hearing, to testify, stating another hearing was
12 scheduled to begin.  (A.R. 681)  She invited Werthy to submit
13 statements from her two witnesses.  (*Id.*)  Then, when the witnesses
14 did submit statements, the ALJ failed to give them fair
15 consideration.  She referred to the statements as being "allegedly"
16 by Messrs. Sandvig and Shea, noting, "Upon first impression, the
17 handwriting is remarkably similar as if the same person wrote these
18 brief statements."  (A.R. 25)  There is nothing in the record to
19 indicate the ALJ is a handwriting expert, competent to reach this
20 conclusion.  As a lay person examining the two handwritten
21 statements, the court does not find the same degree of similarity
22 as did the ALJ.  It was inappropriate for the ALJ to malign
23 statements from the very witnesses she refused to allow to testify
24 at the hearing, even if she chose to accord the statements little
25 weight based on their content or the witnesses' connection to the
26 claimant.  "Disregard of the testimony of friends and family
27 members violates 20 C.F.R. § 404.1513(e)(2) (1991)."  *Smolen v.*
28 *Chater*, 80 F.3d 1273, 1288 (9th Cir. 1996) (citations omitted).  An

63 - FINDINGS AND RECOMMENDATIONS

1 ALJ has "a special duty to fully and fairly develop the record and
2 assure that the claimant's interests are considered," even when a
3 claimant is represented by counsel. *Id.* (internal quotation marks,
4 citation omitted).  The ALJ's actions in this case with regard to
5 the third-party witnesses violated that duty.

6 Werthy further argues the ALJ improperly rejected the voca-
7 tional rehabilitation counsel's "opinion that plaintiff could not
8 work due to pain." Dkt. #15, p. 29.  She argues that even if the
9 counselor's "opinion" was based solely on Werthy's subjective
10 complaints, it was improper for the ALJ to reject the counselor's
11 "opinion." *Id.* (citing *Dodrill v. Shalala*, 12 F.3d 915, 919 (9th
12 Cir. 1993)).  The court disagrees that the vocational rehabili-
13 tation counselor's letter rises to the level of an "opinion."  The
14 letter merely confirmed that Werthy's file was being closed because
15 the counselor and Werthy concluded at a previous meeting that her
16 pain was interfering with her ability to find work.  Without more,
17 neither the ALJ, nor the court, can make any determination about
18 the evidence or circumstances surrounding this conclusion.  There
19 are no records from the counselor's office regarding Werthy's
20 attempts to look for work; types of work she applied for, if any;
21 or circumstances in which her pain significantly interfered with
22 her job search.  The court finds the ALJ did not err in giving the
23 letter no weight.

24
25 ### C.  Inaccurate Hypothetical;
### Ability to Perform Semi-Skilled Work
26
27 Werthy argues the ALJ erred in finding she can performs jobs
28 identified by the VE because the hypothetical question posed to the

VE failed to contain all of Werthy's limitations and impairments.
Dkt. #15, p. 30.  A hypothetical question must reflect *all* of a
claimant's limitations and restrictions.  *Bray v. Comm'r*, 554 F.3d
1219, 1228 (9th Cir. 2009) (citing *Russell v. Sullivan*, 930 F.2d
1443, 1445 (9th Cir. 1991)).  "If an ALJ's hypothetical does not
reflect all of the claimant's limitations, then 'the [vocational]
expert's testimony has no evidentiary value to support a finding
that the claimant can perform jobs in the national economy.'"  *Id.*
(quoting *DeLorme v. Sullivan*, 924 F.2d 841, 850 (9th Cir. 1991)).
Here, the court has found the ALJ erred in her RFC assessment, by
failing to consider the impact of all of Werthy's impairments, both
severe and not severe.  The ALJ also erred in rejecting the third-
party witnesses' statements without adequate justification.  The
ALJ's hypothetical question to the VE, although consistent with the
ALJ's RFC assessment, failed to include all of Werthy's limitations
and restrictions.  The ALJ therefore could not rely on the VE's
testimony to make a determination that Werthy is able to work.  *See*
*Jimerson v. Barnhart*, 51 F. App'x 208, 211 (9th Cir. 2002) (ALJ's
denial of benefits based on VE's opinion derived from incomplete
hypothetical is not supported by substantial evidence) (citing
*Thomas v. Barnhart*, 278 F.3d 947, 956 (9th Cir. 2002)).

Werthy further argues the ALJ erred in finding she can perform
semi-skilled work without identifying any transferable skills, in
violation of SSR 82-41 and 20 C.F.R. § 416.968.  The ALJ found,
"Transferability of job skills is not material to the determination
of disability because using the Medical-Vocational Rules as a
framework supports a finding that the claimant is 'not disabled,'
whether or not [she] has transferable job skills."  (A.R. 26,

65 - FINDINGS AND RECOMMENDATIONS

1   citing SSR 82-41; 20 C.F.R. pt. 404, subp. P, appx. 2).  Werthy

2   argues this finding was erroneous because the ALJ found Werthy

3   capable of performing two semi-skilled jobs that require

4   transferable skills, yet the ALJ failed to identify such skills.

5   Dkt. #15, pp. 30-31.

6       Although the ALJ identified two semi-skilled jobs she found

7   Werthy could perform, she also identified three unskilled jobs

8   Werthy could perform based on the ALJ's RFC determination.  (A.R.

9   27)  Because the court has found the ALJ's RFC determination to be

10   in error, the RFC determination cannot support the ALJ's finding

11   that Werthy can perform the unskilled jobs the ALJ identified.

12

13                  *D.   Numbers of Available Jobs*

14       Werthy argues the ALJ erred in ignoring evidence from the

15   United States Department of Labor, the United States Department of

16   Commerce, and the State of Oregon, regarding "the lack of

17   documentation for numbers of jobs by *DOT* section at both the

18   national and regional levels."  Dkt. #15, p. 31 (citing A.R. 298-

19   304).  Werthy further argues the VE failed to provide a reasonable

20   basis for the numbers of each job he found Werthy could perform.

21   *Id.* (citing A.R. 677-78)  Werthy's attorney objected to the VE

22   testifying about the numbers of jobs that exist in the economy

23   unless the VE brought to the hearing "valid, reliable data to

24   support [his] testimony."  (A.R. 306, 676)  Werthy relies on an

25   unpublished decision from the Western District of Virginia where

26   the court observed that regulations allowing an ALJ to take

27   administrative notice of the availability of jobs as detailed in

28   various governmental publications "does not in any respect resolve

66 - FINDINGS AND RECOMMENDATIONS

the issue . . . [of] whether the job information presented by the VE was statistically reliable in the first instance." *King v. Comm'r*, No. 7:06cv00490, 2007 WL 2471443, at *4 (W.D. Va. Aug. 24, 2007).

The ALJ and the VE relied on the *Dictionary of Occupational Titles* ("DOT") (*see* A.R. 676), "a publication recognized by the Social Security regulations as a source of 'reliable job information.'" *Crane v. Barnhart*, 224 F. App'x 574, 578 (9th Cir. 2007) (quoting 20 C.F.R. § 404.1566(d)(1) (2006)).   The regulations specifically provide that in determining whether work exists in significant numbers in the national economy, the agency may take administrative notice of the DOT, among other publications.   20 C.F.R. § 404.1566(d)(1).   Although Werthy's attorney submitted a letter dated January 16, 2003, from the Director of the U.S. Census Bureau, indicating the DOT "is no longer in use . . . [and] was replaced by the Standard Occupational Classification (SOC)" (A.R. 302), counsel has offered no evidence that the DOT is no longer used across the board by *all* governmental agencies.   Indeed, before an ALJ may rely on a VE's testimony, the ALJ first must inquire as to whether the testimony conflicts with information in the DOT. *Massachi v. Astrue*, 486 F.3d 1149, 1152 (9th Cir. 2007) (noting the Third, Seventh, and Tenth Circuits are in accord).   The ALJ complied with that requirement here.   (*See* A.R. 676)

The court finds the ALJ did not err in failing to consider documentation submitted by Werthy about the lack of supporting data for the numbers of jobs cited by the DOT.

/ / /

/ / /

67 - FINDINGS AND RECOMMENDATIONS

1

### VI.   CONCLUSION

2  The court has the power to enter a judgment affirming,

3  modifying, or reversing the Commissioner's decision, with or

4  without remand for further proceedings.  42 U.S.C. § 405(g).  The

5  court has "discretion to remand a case either for additional

6  evidence and findings or to award benefits."  *Smolen*, 80 F.3d at

7  1292 (citation omitted).  If the record has been fully developed

8  and further administrative proceedings would not serve any useful

9  purpose, then the court may direct an immediate award of benefits.

10  *Id.*

11  In this case, however, the court finds further proceedings are

12  warranted.  The case should be remanded with instructions to the

13  ALJ to consider the combination of *all* of Werthy's impairments,

14  including those deemed not severe, in assessing her RFC and in

15  formulating an appropriate hypothetical question for the VE; and to

16  give proper consideration to the third-party statements (and/or to

17  solicit testimony from those witnesses).  I therefore recommend the

18  Commissioner's decision be reversed and the case be remanded for

19  further proceedings consistent with this opinion.

20

21

### VII.   SCHEDULING ORDER

22  These Findings and Recommendations will be referred to a

23  district judge. Objections, if any, are due by **September 19, 2011.**

24  If no objections are filed, then the Findings and Recommendations

25  will go under advisement on that date.  If objections are filed,

26  then any response is due by **October 10, 2011.**  By the earlier of

27

28

68 - FINDINGS AND RECOMMENDATIONS

1   the response due date or the date a response is filed, the Findings

2   and Recommendations will go under advisement.

3        IT IS SO ORDERED.

4                              Dated this 2nd day of September 2011.

5

6                              /s/ Dennis J. Hubel
                               _____
7                              Dennis James Hubel
                               Unites States Magistrate Judge

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

69 - FINDINGS AND RECOMMENDATIONS